Harold OWEN, Jr.

v.

**ROYAL INDUSTRIES, INC. and Home Indemnity Company.**

Supreme Judicial Court of Maine.

Jan. 7, 1974.

Basil A. Latty, Robert N. Walker, Yarmouth, for plaintiff.

Mahoney, Robinson, Mahoney & Norman, by Robert F. Hanson, Portland, for defendants.

Before DUFRESNE, C. J., and WEATHERBEE, POMEROY, WERNICK, ARCHIBALD and DELAHANTY, JJ.

WEATHERBEE, Justice.

On April 19, 1971 the petitioner, along with other crew members of Owen and Freeman Building Contractors, was working on trusses which were to support the roof of a new building owned by Royal Industries, Inc. of Scarboro. While so working, the petitioner fell 30 to 35 feet when a truss collapsed under him. This fall caused broken bones and internal injuries which seriously incapacitated the petitioner. After this incident, the petitioner brought a petition to determine the extent of permanent impairment and a petition for award of further compensation, both before the Industrial Accident Commission. A hearing was held, and the Commissioner denied relief under both petitions. The Superior Court affirmed in a pro forma decree, and the petitioner has now appealed. We deny the appeal.

The Commissioner's decrees stated that relief under the workmen's compensation statutes was denied because the petitioner had not established that he was employed by Royal Industries, Inc. on April 19, 1971. The Commissioner found instead that the petitioner was employed only by Owen and Freeman, a partnership subcontractor. The petitioner maintains that he *was* an employee of Royal Industries, Inc. on the day of the mishap and should therefore qualify for workmen's compensation benefits.

Recitation of more background material will clarify the employment status of the petitioner on the day in question. The petitioner is a carpenter and had been employed by his brother and brother-in-law, the two partners in Owen and Freeman Building Contractors. For approximately a year prior to the accident, the partnership and its crew had done home building work on a subcontracting basis for Imperial Homes, Inc., a separate corporation functionally related to Royal Industries, Inc. Mr. Norman Ceaser is president of both corporations. Royal manufactures prefabricated housing components and Imperial is a retail builder of homes from these components. Owen and Freeman had never before done any work for Royal Industries, Inc. as a partnership, although as individuals the partners had done some odd jobs on a per hour basis for Mr. Ceaser. Mr. Ceaser was familiar with the partnership from its work done for Imperial Homes, Inc. in the months prior to April 19, 1971.

At this time, Mr. Ceaser was anxious to complete the new Royal Industries, Inc. plant, so he called as he said, "boys in the business" who might be interested in working on the plant. Some of these persons were his former subcontractors and some had never worked for him before. Owen and Freeman and crew responded, and in the course of this one day's work the petitioner was injured.

Ordinarily, factual findings of the Commission are declared to be final under 39 M.R.S.A. § 99. In Matthews v. R. T. Allen & Sons, Inc., Me., 266 A.2d 240 (1970), we construed this language to mean that the Commission's findings will not be upset

unless "clearly erroneous".[1] In the instant case, we are applying this clearly erroneous standard of review in deference to the fact-finder who has viewed the witnesses and is more capable of judging their credibility than is the appellate court.

The burden of persuasion rests upon the claimant in an industrial accident case to prove that he was employed by the defendant employer on the date of the accident. *See* White v. Monmouth Canning Co., Me., 228 A.2d 795 (1967). As there is no history of regular work with Royal Industries, Inc. on the part of the petitioner, the presumption of employment discussed in Murray's Case, 130 Me. 181, 154 A. 352 (1931) does not arise to help the petitioner meet his burden. *See* Madore v. Liberty National Bank, Me., 289 A.2d 36 (1972).

In finding that the petitioner was not employed by Royal Industries, Inc., the Commission noted that he was regularly employed by Owen and Freeman, a partnership which acted as an independent contractor. Whether the petitioner was employed by Royal Industries, Inc. when the accident occurred is the issue presented for our review.

The definition of an employee covered under our workmen's compensation statute is found in 39 M.R.S.A. § 2(5):

" 'Employee' shall include . . . every person in the service of another under any contract of hire, express or implied, oral or written . . . . ."

In the past this Court has proclaimed the principal test to be used in determining the existence of an employer/employee relationship.

"We reiterate that the vital test to prove the existence of the employer-employee relationship is whether or not the employer has retained the right to control. The right to control on the other hand is best established by the right in the employer . . . to discharge the employee at will." In re Dudley, Me., 256 A.2d 592, 595 (1969).

It is the right to control and the right to fire, not the exercise of these rights, which we deem to be important criteria in establishing an employment status.

Prior to the accident, the petitioner had been employed as a carpenter by Owen and Freeman, who in turn had contracted with Imperial Homes, Inc. to erect buildings on a square footage basis. During this period the petitioner was paid weekly by the partnership, which deducted taxes and social security from the crew's pay. The two partners controlled the workings of the crew during this subcontracting work. There is little doubt that during this period the petitioner had been under the control of Owen and Freeman and could be discharged by them. They, in turn, were not general employees of Imperial Homes, Inc. but were independent contractors hired on a relatively long-term basis.[2] Therefore, until the date in question, the petitioner was correctly classified as an employee of an independent contractor. Next, we must determine if this status changed because of the events of April 19, 1971.

An examination of the exact circumstances immediately preceding petitioner's starting to work on the Royal building aids in our understanding of the relationship of the parties.

When Mr. Freeman went to the plant the day before the accident to pick up material to use on the motel, Mr. Ceaser stated that "he wanted some more men down there to put up the trusses". He said:

"[C]ome over, get all the men you can, we need to move your men on this plant."

---

1. For a short discussion of the reviewability of a factual finding of employment in both disputed and undisputed situations, *see* Clark's Case, 124 Me. 47, 126 A. 18 (1924).

2. We reach this conclusion, agreeing with the Commissioner below, by examining the situation in terms of the guidelines expressed in Murray's Case, supra.

In response to this the partners called back to work some of their former employees and these, along with their regular crew were present at the motel the next morning when Mr. Ceaser's superintendent came to the motel and told Mr. Owen (the partner) to bring his crew over to the new plant.

"No particular men, just bring a crew over and put them to work."

Mr. Owen and Mr. Freeman then took their entire crew off the unfinished Imperial motel job and went to the site of the construction of Royal's new plant. At this time the partners apparently expected to continue under their existing arrangements under which the partnership received a fixed price per square foot of construction and then paid their men an hourly rate based upon each individual's work ability.[3] This, hopefully, left a balance to cover the partnership's overhead and to provide a profit. However, when they arrived at the site they found that many other men were already working on the building—crews of other subcontractors of Mr. Ceaser and some of Ceaser's own employees. This made it impossible for the partnership to be compensated on their usual square foot basis.

Furthermore, when the men learned of the dangerous nature of the work they were expected to perform, they told the partners that they would not work on the high trusses unless they were paid $5.00 an hour. Mr. Owen and Mr. Freeman then discussed this problem with Mr. Ceaser and it was then agreed that Mr. Ceaser would pay $5.00 per man hour worked by Mr. Owen and Mr. Freeman themselves and by each man of their crew.

The recollection of Mr. Owen (the partner) as to Mr. Ceaser's direction of the crew of the partnership is reflected in the following questions and answers:

"Q You know if anybody gave instructions to work on the job that day?

A Just at the start of the job.

Q Who gave you instructions?

A Mr. Ceaser.

. . . . . .

Q All Mr. Ceaser told them was where to start, didn't he, where to go to work?

A No, he had a little plan, and we all gathered around and he says this is what has to be done, and we went up and done it.

Q He showed you on the plan what the job was and you took your men and took over the job and did it, isn't that right?

A Well, the section of it.

Q That's what I mean, your area?

A Yes."

The partnership submitted to Mr. Ceaser a single bill for the men's services that day and then paid each man individually from the single check received from Ceaser. Although the partnership's office had formerly made the social security and other such deductions from wages due the men, it was not done for this single day. Mr. Freeman explained this:

"CHAIRMAN KEANEY: Any particular reason why it was done this way rather than the way you usually do it?

WITNESS: No, except that everything was kind of mixed up right at that time, and they were told they were paid $5.00 an hour for the job, you know, so that's what we gave them."

We find the following differences in working arrangements on April 19, 1971 as compared to those months previous to

---

3. For example, the partnership had paid the petitioner $4.50 per hour.

that date. First, the petitioner worked on a Royal Industries, Inc. project for the first time. Second, the mode of payment was hourly rather than the normal square footage. Third, Mr. Ceaser was present in a general supervisory capacity. Fourth, the partners omitted withholding any taxes or social security from the petitioner's check.

These factors, either alone or in combination, do not change the petitioner's status as an employee of Owen and Freeman on the day of the accident. The mere fact that the petitioner worked on a Royal Industries, Inc. project for the first time did not indicate a change in control over his employment status. Mr. Ceaser hired the crew through the partnership, just as he had done for Imperial Homes, Inc. It is quite reasonable to believe that the partners' willingness to forego briefly the usual method of compensation which had permitted them a margin for overhead and profit above the amount they paid out as wages was impelled, on one hand, by a desire, not to lose the good will of Mr. Ceaser whose other corporation was such an important source of their income and, on the other, by their crew's refusal to work on the high trusses for less than $5.00 per hour. The entire evidence suggests that this is in the nature of a compromise decision based upon expediency rather than as an intention to abandon their right to control their crew. The supervisory role of Mr. Ceaser is in dispute, for no witness seemed certain about Ceaser's powers as contrasted to those of the partners. Mr. Ceaser obviously was generally directing the work, but whether this was only as to result and not as to progress remains a debatable issue. Whether he, as opposed to the partners, could have discharged the petitioner is likewise not clearly resolved. However, the general tenor of the situation indicates that the partners still retained control of the crew members in this respect. Lastly, the failure of the partners —or Mr. Ceaser—to withhold any deductions from the pay checks has little meaning in view of the partner's explanation.

We find that the record contains credible evidence supporting the decision below. We cannot say that the Commission's conclusion that the petitioner was an employee of Owen and Freeman and thus under their control and direction was clearly erroneous. Having proved no employment relationship with Royal Industries, Inc., the petitioner is not entitled to compensation from the defendants.

The entry will be:

Appeal denied.

Ordered that $350.00 to cover counsel fees and expenses, plus the cost of the record, be paid by the appellees to the appellant.

All Justices concurring.