**John S. TIMBERLAKE**

v.

**FRIGON & FRIGON, et al.**

Supreme Judicial Court of Maine.

Argued Nov. 13, 1981.

Decided Jan. 7, 1982.

Richard M. Morton (orally), Farmington, for plaintiff.

Wheeler, Arey & Millett, P.A., Clyde L. Wheeler (orally), Waterville, for defendant.

Before McKUSICK, C. J., ROBERTS, CARTER, VIOLETTE and WATHEN, JJ., and DUFRESNE, A. R. J.

ROBERTS, Justice.

John S. Timberlake's Petition for Award of Compensation was denied by the Workers' Compensation Commission. From a pro forma decree affirming that denial Timberlake brings this appeal. We vacate the judgment below, and remand to the Commission for further proceedings.

The facts presented to the Commission were not in dispute, primarily because the Commissioner, in effect, directed a verdict for Frigon & Frigon (hereafter "Frigon") at the conclusion of Timberlake's presentation of evidence.[1]

On August 27, 1979, Timberlake fell a distance of fifteen feet while helping Frigon load logs onto Timberlake's truck. The parties stipulated that Timberlake was injured as a result of the fall, and that he was disabled for approximately two months thereafter. The issue before the Commissioner was that of Timberlake's employment status: was he an employee of Frigon or an independent contractor? If the latter, he would not be entitled to workers' compensation benefits from Frigon. *See In re Dudley,* Me., 256 A.2d 592, 594 (1969).

Before 1977 Timberlake worked as a truck driver on a salary or per hour basis. In 1977 he went into the trucking business on his own, owning and maintaining his own truck. He worked for several other jobbers before Frigon, with whom he started work five weeks prior to the date of his injury. Timberlake's 1978 and 1979 federal income tax returns reflect that Timberlake listed himself as self-employed, that he had an employer's identification number, that he paid self-employment taxes, and that he deducted depreciation, insurance and repair expenses for his truck. Frigon withheld no money from Timberlake's pay for taxes.

Frigon is a jobber who was working for Boise-Cascade. Its job was to cut wood and transport it to Boise-Cascade's mill. Frigon did not own any trucks. Instead, Frigon hired several truckers to haul wood; all, including Timberlake, were paid at the same rate by the cord of wood, delivered. Frigon directed what kind of wood Timberlake hauled (his rate of pay varied according to the kind of wood hauled), where to take the loads of wood (but not how to get there), how many loads to take each day, and whether Timberlake was to work at all each day (on days Timberlake did not work for Frigon he sometimes hauled loads for others). The loading of trucks was done by Frigon, while unloading appears to have been performed by employees of Boise-Cascade. Timberlake had no written contract with Frigon; he believed that he could quit or be fired at anytime. Timberlake drove alone.

The Commissioner issued a decision that stated merely that Timberlake's Petition was denied. Timberlake did not thereafter request further findings of fact or conclusions of law pursuant to 39 M.R.S.A. § 99, thus depriving this court of the ability "to determine whether [the Commissioner's] decree was based upon a misapprehension of fact or a misapplication of law to the facts." *White v. Forster Manufacturing Co.,* Me., 421 A.2d 55, 56 (1980). We must treat the Commissioner as having made all factual determinations which could, in accordance

---

1. The single hearing held before the Commission concluded as follows:

    COMMISSIONER: Well, let's finish on the employee-independent contractor, do you have any more evidence to present on that?
    [TIMBERLAKE'S COUNSEL]: No, I don't.
    COMMISSIONER: Well, without your presenting any other evidence, I don't think there's any question in my mind that Mr. Timberlake was an independent contractor.

    .    .    .    .    .

    [TIMBERLAKE'S COUNSEL]: Would you withhold your ruling until you've had an opportunity to review a very brief legal memorandum?

    .    .    .    .    .

    COMMISSIONER: Okay, I'd be interested in seeing them. If you do [submit memoranda], and I feel I'm going to change my mind, I'm going to give [Frigon's counsel] a chance to put things on.
    [Hearing concluded.]

with correct legal concepts, support his decision,[2] testing the assumed findings by the clearly erroneous standard. *Gorrie v. Elliott Jordan & Son, Inc.*, Me., 408 A.2d 1008, 1011 (1979).

We must next determine the proper standard of review. Where, as here, the facts are undisputed, we have characterized the issue of employment status both as a question of law [3] and as a question of fact.[4] Our ambivalence may perhaps be explained by our implicit recognition that while the issue of employment status is not a pure factual question, neither is it an area in which we are as qualified as the Commission to make individual judgments in specific factual settings. In short, we defer to the Commission's expertise where it has applied the relevant legal criteria to the facts. *See Wing v. Cornwall Industries*, Me., 418 A.2d 177, 181 (1980); *Jacobsky v. C. D'Alfonso & Sons, Inc.*, Me., 358 A.2d 511, 514–15 (1976). Thus, we recognize that there exists with regard to the issue of employment status a decisional range in which reasonable Commissioners, acting rationally, could disagree. Only when a Commissioner's decision falls outside of this range, or when a Commissioner misconceives the meaning of the applicable legal standard, are we justified in interfering with his determination. *See Wing*, 418 A.2d at 181.

Timberlake has the burden of proof on the issue of employment.[5] *Black v. Black Brothers Construction*, Me., 381 A.2d 648, 650 (1978). "Employee" is defined in part as "every person in the service of another under any contract of hire, express or implied, oral or written . . . ." 39 M.R.S.A. § 2(5)(A). We have often stated that the vital issue in proving an employee-employer relationship is whether or not the employer has the power of control or superintendence over the petitioner. *See, e.g., Black*, 381 A.2d at 650; *Poulette v. Herbert C. Haynes, Inc.*, Me., 347 A.2d 596, 599 (1975); *In re Dudley*, Me., 256 A.2d 592, 595 (1969); *Murray's Case*, 130 Me. 181, 185, 154 A. 352, 354 (1931). We have further enumerated eight commonly accepted tests helpful in resolving this issue, noting that no one factor will be decisive:

"(1) the existence of a contract for the performance by a person of a certain piece or kind of work at a fixed price; (2) independent nature of his business or his distinct calling; (3) his employment of assistants with the right to supervise their activities; (4) his obligation to furnish necessary tools, supplies, and materials; (5) his right to control the progress of the work except as to final results; (6) the time for which the workman is employed; (7) the method of payment, whether by time or by job; (8) whether the work is part of the regular business of the employer."

*Madore v. Liberty National Bank*, Me., 289 A.2d 36, 38 (1972) *quoting Murray's Case*, 130 Me. at 186, 154 A. at 354; *Kirk v. Yarmouth Lime Co.*, 137 Me. 73, 78, 15 A.2d 184, 187 (1940).

The "control test" springs from the common law definition of "employee" or "serv-

2. Thus, while the Commissioner made oral findings of fact and conclusions of law *before* issuing his written decree, we cannot rely upon them on appeal. The Commissioner may have reconsidered the bases of his decision between the time of the hearing and the time that he issued his decree. Reconsideration was especially likely here, since after the hearing the parties submitted legal memoranda to the Commissioner.

3. *See, e.g., Black v. Black Brothers Construction*, Me., 381 A.2d 648, 650 (1978) (employment status is legal conclusion drawn from established facts; where facts are undisputed Law Court is not bound by Commissioner's conclusion); *Cardello v. Mt. Hermon Ski Area, Inc.*, Me., 372 A.2d 579, 581 (1977) (court examines record to see if Commissioner misapplied legal principles of employment status to established facts); *In re Dudley*, Me., 256 A.2d 592, 594 (1969) (no factual dispute; issue of whether petitioner is employee within Work-

ers' Compensation Act is one of law, so Law Court not bound by Commissioner's reasoning or conclusion).

4. *See Owen v. Royal Industries, Inc.*, Me., 314 A.2d 60, 62 n.1 (1974) *citing favorably Clark's Case*, 124 Me. 47, 50, 126 A. 18, 20 (1924) (where ordinary minds might ordinarily conclude oppositely from the same elemental premises, question of existence of employee relationship is for trier of facts).

5. Timberlake argues that he is entitled to be presumed an employee, relying on *In re Dudley*, Me., 256 A.2d 592, 595 (1969). The presumption there spoken of arises only when the petitioner has a history of regular work under general employment with the employer. *Madore v. Liberty National Bank*, Me., 289 A.2d 36, 38 (1972); *see Owen v. Royal Industries, Inc.*, Me., 314 A.2d 60, 62 (1974). Because there is no such history evident on the record in the instant case, no such presumption arises.

ant," formulated for vicarious tort liability purposis, and serving to limit an employer's liability for injuries, not *to* his employees, but rather *caused by* his employees. 1C A. Larson, *Workmen's Compensation Law* § 43.10 (1980). We recognize that the purpose of limiting vicarious tort liability served by the common law definition of "servant" differs from the purposes which the concept of "employee" serves in the Workers' Compensation Act, *see id.* § 43.42, and that "[i]n applying the general principles of law governing the relations of master and servant to cases involving [Workers'] Compensation, it should be kept in mind that by explicit legislative mandate the provisions of the Act are to be liberally construed." *Murray's Case*, 130 Me. at 185, 154 A. at 354.

■ In the past we have emphasized the right to control and stated that it is best established by the right in the employer to discharge the employee at will. *See In re Dudley*, 256 A.2d at 595; *Murray's Case*, 130 Me. at 187–88, 154 A. at 354–55. While the control test is useful in determining employment status, we see such factors as the nature of the petitioner's work and its relation to the employer's business as having special importance beyond the determination of the employer's right to control. In so stating, we would diminish somewhat the impact of common law master-servant concepts and seek to accomplish in this uniquely statutory field a result more consistent with the ultimate purposes of the Workers' Compensation Act.[6]

[T]he law should consider, in determining whether an employer-employee status exists, not only the matter of control but also the relationship between the claimant's own occupation and the regular business of the asserted employer. Larson, [*Workmen's Compensation Law*] §§ 43.50 and 43.51. With regard to the latter aspect of the problem, two consid-

erations have weight: First, how much of a separate calling or profession is the claimant's occupation? How skilled is it? To what extent may it be expected to carry its own share of the Workmen's Compensation responsibility? Second, what relationship does the claimant's work bear to the regular business of the asserted employer? Is there a continuous connection or only an intermittent one, or is there no connection at all?

*Sandy v. Salter*, 260 Ark. 486, 489, 541 S.W.2d 929, 931 (1976). By giving special emphasis to these factors, the Commission will be able to apply a functional test most helpful in answering the ultimate question of whether or not the relationship between the petitioner and the employer is of the type which was intended to be protected by the Workers' Compensation Act. *See Searfus v. Northern Gas Co.*, 472 P.2d 966 (Alaska 1970); *Burton v. Crawford and Co.*, 89 N.M. 436, 553 P.2d 716 (1976); *Woody v. Waibel*, 276 Or. 189, 554 P.2d 492 (1976). These two factors, as well as the other commonly accepted tests of control, are all "basically designed to draw a distinction between those occupations which are properly classified as separate enterprises and those which are in fact an integral part of the employer's regular business." *Smith v. E.T.L. Enterprises*, 155 N.J.Super. 343, 350, 382 A.2d 939, 942 (1978).

In the instant case Timberlake was hired to haul logs for an unspecified period of time. His pay was based upon what he hauled each day, not upon a lump sum for completing some assigned job. Timberlake was not required to furnish any tools other than his truck; Frigon supplied tools for loading the truck. Frigon controlled not only what Timberlake hauled and to where he hauled it, but also when and how often Timberlake hauled loads.[7] Timberlake was not under contract to perform a particular task; he could be fired by Frigon at any

---

6. Support for according special treatment to these factors outside of their previously recognized relevance in determining the extent of the employer's right to control is found in 39 M.R. S.A. § 2(5)(A)(2), which excludes from the defined class of employees "[a]ny person whose employment is not in the usual course of the business, profession, trade or occupation of his employer."

7. It is true that Timberlake controlled the manner in which he drove his truck. We might find that fact more significant were we here deter-

mining Timberlake's employment status in the context of a vicarious tort liability claim, since an employer with the right to control a driver's speed and manner of driving might logically be held liable for damages caused to third parties by his driver's unsafe driving. But here we are concerned with industrial injuries suffered by a worker. In that context, the worker's control of the detail of the actual operation of his truck is of little significance. *Cf. Mitchell's Case*, 130 Me. 516, 154 A. 184 (1931).

time. While trucking can be characterized as a distinct calling, here the transportation of wood to Boise-Cascade's mill appears to have been part of Frigon's regular business. *Cf. Kirk v. Yarmouth Lime Co.*, 137 Me. 73, 74, 15 A.2d 184, 185 (1940) (deliveries were part of Lime Company's regular business though Company owned no trucks). Thus, under the traditional control test the factors weigh heavily towards an employer-employee relationship.

■ We find of little consequence the evidence concerning Timberlake's income tax returns or Frigon's withholding practices. While that evidence may bear upon the parties' intentions, one might "intend to enter into an independent contractual relationship and still the terms of the employment be such that the law would determine his status as that of an employee...." *Kirk*, 137 Me. at 79, 15 A.2d at 187. Furthermore, as Larson points out:

> With the advent of social and labor legislation, ..., and other modern enactments drawing a distinction between independent contractors and employees, there has been an increasing effort on the part of employers to avoid both the financial cost and the bookkeeping and reporting inconvenience that goes with workmen's compensation, unemployment compensation, social security, and the like. This effort usually takes the form of subcontracting portions of the employer's production and distribution process, particularly in peripheral areas like obtaining raw material, trucking, delivering and selling. ... [T]hese arrangements are often carefully drawn with an eye to the "control" test....

1C A. Larson, *supra* § 45.10 (footnotes omitted); *see Rutherford v. Modern Transportation Co.*, 128 N.J.Super. 504, 509, 320 A.2d 522, 525 (1974). Thus, withholding practices may simply reflect an attempt to avoid responsibility for providing workers' compensation coverage.

■ The record reflects little evidence of the nature of Timberlake's work and its relationship to Frigon's business. On the record before us, however, we find that the other factors weigh so heavily in favor of an employer-employee relationship as to take this case outside of that range within which we must defer to the Commission's expertise. We vacate the judgment, and remand to the Commission for further proceedings to allow both parties the opportu-

nity to present evidence if they so desire and thereby permit the Commissioner to rule upon a complete record.

The entry is:

Judgment vacated.

Remanded to the Workers' Compensation Commission for further proceedings in accordance with the opinion herein.

It is further ordered that the employer pay to the petitioner an allowance of $550.00 for his counsel fees, plus his reasonable out-of-pocket expenses for this appeal.

All concurring.