**Viola SARGENT–Widow of Raymond F. Sargent (Employee–Fatal)**

v.

**RAYMOND F. SARGENT, INC. and/or The Employers' Liability Assurance Corporation, Ltd.**

Supreme Judicial Court of Maine.

Sept. 22, 1972.

**36**

Silsby & Silsby, by Herbert T. Silsby, II, Ellsworth, for plaintiff.

Mahoney, Desmond, Robinson, & Mahoney by David C. Norman, Portland, for defendant.

Before DUFRESNE, C. J., and WEBBER, WEATHERBEE, POMEROY, WERNICK and ARCHIBALD, JJ.

ARCHIBALD, Justice.

Viola Sargent, widow of Raymond F. Sargent (Raymond), seasonably filed a petition with the Industrial Accident Commission alleging that her deceased husband met his death in an accident arising out of and in the course of his employment with Raymond F. Sargent, Inc. (Company), the Commission awarded compensation and the Company appealed from the pro forma decree of the Superior Court approving the action taken by the Commission.

The only issue is whether Raymond's death in an airplane crash during the process of landing on a wilderness lake (Harrington Lake), Raymond being the pilot, arose out of and in the course of his employment. It is conceded that the Company owned the airplane, used it for business purposes, and that Raymond's employment, at least in part, required him to serve as pilot.

The hearing commissioner, on the facts before him, found that although when Raymond "started his landing approach at Harrington Lake, he deviated from the course of his employment," the "deviation was insubstantial" and, therefore, "compensation is not to be denied." The appellants urge that the Commissioner was in error in ruling that the deviation was "insubstantial" and bottoms the appeal on the theory that, as a matter of law, Raymond "was outside of the course of his employment when he sustained his fatal injuries."

As we view the case, and basic to our ultimate decision, it is necessary to determine whether the Commissioner was correct in ruling that there had been a deviation from the course of employment by the decedent at the time of the fatal accident.

We begin our discussion, prior to a detailed analysis of the facts, with a recitation of the general legal principles involved.

By its own terms the Workmen's Compensation Act (39 M.R.S.A. § 1 et seq.) demands of the Industrial Accident Commission that, "in interpreting this Act it shall construe it liberally and with a view to carrying out its general purpose." 39 M.R.S.A. § 92.

Our Court has said, "[i]n dealing with the Workmen's Compensation Act, its provisions must be liberally construed in favor of the workman and those dependent upon him." Kirk v. Yarmouth Lime Co. and Travelers Insurance Co. (1940), 137 Me. 73, 74, 15 A.2d 184, 185.

Additionally, the Petitioner, being Raymond's widow, is entitled to the benefits of 39 M.R.S.A. § 64-A, which provides:

"In any claim for compensation, where the employee has been killed, or is physically or mentally unable to testify, there shall be a rebuttable presumption that the employee received a personal injury by accident arising out of and in the course of his employment, that sufficient notice of the injury has been given, and that the injury or death was not occasioned by the willful intention of the employee to injure or kill himself or another."

We have recently considered the purpose served by this presumption, and concluded that it did not operate to shift the ultimate burden of proof from the claimant to the employer, but is a procedural device casting on the employer only the burden of going forward with evidence. We said in Metcalf v. Marine Colloids, Inc. (Me.1972), 285 A.2d 367, 368:

"If and when evidence is produced which is believed by the Commission and which makes it as probable that the presumed fact did not exist as that it did exist, the presumption has fulfilled its procedural task and thereupon disappears from the case. If, however, such evidence is not produced, the presumption persists and compels a decision on the issue of compensable accident favorable

to the petitioner. See Hinds v. John Hancock [Mutual Life] Ins. Co. (1959) 155 Me. 349, 364, 155 A.2d 721."

Relating this rule to the facts before us, Mrs. Sargent is entitled to the presumption that her husband's death was caused by an accident which arose out of and in the course of his employment. Absent rebuttal testimony making it as probable, in the mind of the fact finder, that the fatal accident did not so arise and was not so caused as it is probable that it did, she becomes entitled to an award.[1]

While this Court is bound by the factual findings of the Commissioner, unless they are clearly erroneous, and has no right to substitute its own appraisal of the facts, the law does permit a review of factual conclusions based on inference.

" 'But the inferences which the commissioner draws from proved or admitted circumstances must needs be weighed and tested by this court. Otherwise it cannot determine whether the decree is based upon evidence or conjecture.

In other words, the court will review the commissioner's reasoning, but will not, in the absence of fraud, review his findings as to the credibility and weight of testimony.' . . . . "

Stanley v. Petroleum Tank Service, Inc. (Me.1971), 284 A.2d 280, 281.

This brings us to the vital question: Was the finding of "deviation" (whether or not insubstantial) from the attempted landing on Harrington Lake a pure factual conclusion, or was it an inference drawn from "proved or admitted circumstances"? To resolve this, we must, of necessity, examine the facts in detail.

The Company, of which Raymond was the President, was engaged in the construction business. Adelbert Sargent (Adelbert), Raymond's brother, was an occasional Company employee and was also the caretaker of camps located on Harrington Lake, property in which the Company had no ownership or interest.

The Company owned, and used for business purposes, a Cessna airplane which was flown on floats, and which was usually piloted by Raymond, although occasionally by Adelbert, also a pilot. Whatever hazards are inherent in flying an airplane designed to be flown off and onto water were incidental to Raymond's employment. These hazards would naturally include the surface conditions of the water on which the plane lands, whether rough, calm, choppy, smooth or "glassy." There was no evidence introduced from which a finding could be made that landing an airplane on water, whatever the surface conditions might be, posed any unusual or overhazardous problems to this particular aircraft. Nor was there any evidence from which it could be found that Raymond's capabilities as a pilot were limited by surface conditions, whatever they might be.

The Company had entered into a construction contract with the Bangor Hydro-Electric Company to make structural repairs to a dam (Lock Dam) on Chamberlain Lake,[2] some 125 air miles due north of Ellsworth. Although Adelbert met his death in the accident, his relationship with the Lock Dam project was preserved in the record by the testimony of Kenneth Cosseboom, Chief Engineer of the Bangor Hydro-Electric Company. The Engineer was instructed by the Company's president, Raymond, to deal with Adelbert on such problems as might arise during the construction period and he did so.

1. The Commissioner's decree does not recite what use, if any, he made of this rule.

2. This lake lies on the identical course from Ellsworth as does Harrington Lake; *i. e.*, a plane flying a straight course from

Chamberlain Lake to Ellsworth would go directly over Harrington Lake. Both lakes are inaccessible by conventional vehicles, a boat or plane equipped with floats being the usual means of transportation.

Edward R. Sargent, the Company Treasurer, described the project manager as "actually two people . . . my uncle Adelbert and my father, Raymond Sargent." Although Adelbert was not listed on the Company payroll at the time of the fatal accident, the Treasurer testified that Adelbert occasionally flew the Company plane "to help in Company business" and, relating to the Lock Dam project, "I know he left Ellsworth for there and he came back with records of things that had happened there, so I assume he went there and returned."

Mr. Cosseboom testified that on October 28, 1966, he met, *by pre-arrangement,* at Lock Dam with both Adelbert and Raymond "to see if the work had been completed," both Sargents participating in the "close out" conference. To keep this appointment the Engineer himself had been flown to Lock Dam by a Bangor Hydro-Electric Company airplane.

On the day prior to the fatal accident, Adelbert, using the Company plane, had flown one Wilbur Ricker to the camps at Harrington Lake for the purpose of "closing up." Mr. Ricker was hired to do this by Adelbert, who was "general caretaker of the camps." Although Mr. Ricker preferred to do this work on October 28th and 29th, at Adelbert's urging and to "help him out," he agreed to do so on the 27th and 28th. *Why* these particular dates would "help out" does not appear in the record. However, it was *prearranged* that Mr. Ricker would be picked up by plane on the 28th and returned to his home.

Mrs. Sargent and the Company Treasurer both testified that Raymond left Ellsworth on the morning of October 28th in the Company plane, and that his destination was Lock Dam.

The Sargent plane landed on Harrington Lake on the morning of the 28th, made a brief visit, and left for Lock Dam. The record does not disclose whether Raymond or Adelbert was acting as pilot on this occasion, but the visit only lasted "probably

15 minutes" because "Raymond was anxious and said [to Adelbert], let's get going."

The Sargent brothers arrived at Lock Dam "around 9 or 9:30," stayed "about an hour and a half" and then left for Greenville, some fifty-five miles distant southerly, for motor repairs to the airplane, returning and landing in less than two hours. Who the pilot was on the trip to Greenville and return is not disclosed.

One Donald Grindle, a Company employee, had been working at the construction site and was the surviving passenger in the airplane at the time of the fatal accident. From him we learn that the plane, piloted by Raymond, left Lock Dam "about 4 o'clock," made a stop at "Telos" (another area of Chamberlain Lake) to pick up some "gasoline cans," and proceeded on to Harrington Lake.

Mr. Grindle described the accident in these words:

"Well, the lake was glass clear, you know, no ripples or nothing. I don't know when we hit the water I thought myself that we were about thirty feet off the water, but we wasn't we went right into it. The plane turned over and went under."

As to Mr. Grindle's knowledge of the purpose for this landing, the record, on cross-examination, discloses the following:

"Q. To the best of your knowledge they were flying into Harrington Lake to pick up Bill Ricker?

A. We was flying in there. I don't know whether we were going to pick Bill up or whether he was going to stay another day or what. I don't know and I never did know, or find out."

The Commissioner, on these facts, drew the inference that the abortive landing on Harrington Lake was a *deviation* by Raymond from the course of his employment. To reach this conclusion he must have reasoned that Raymond's only purpose for the

attempted landing was to pick up Mr. Ricker which was unrelated to any Company business. The Commissioner used this language:

"Notwithstanding the fact that landing at Harrington Lake may have increased the risk of injury, we are inclined to say that the deviation was insubstantial, and that the departure from the course of duty was negligible. We conclude that although Mr. Raymond Sargent while landing on Harrington Lake had temporarily gone beyond what his duties required, compensation is not to be denied."

It is clear that the record contains no direct evidence of Raymond's intent and purpose for making the attempted landing. For example, we know facts indicating *why* he landed twice at Lock Dam, namely, to meet and consult with the Bangor Hydro-Electric Company engineer. We know *why* he went to Greenville, namely, to have the airplane engine repaired. We know *why* he landed at "Telos," namely, to pick up empty gasoline cans. However, the only reason advanced for landing at Harrington Lake comes, *not from Raymond but from Mr. Ricker* who quotes Adelbert as his authority, *not Raymond*. Whether or not the Harrington Lake landing, *in Raymond's* mind, served any Company purpose, however slight, we do not know from any direct evidence attributable to him.

Therefore, we must conclude that the Commissioner was drawing an *inference* when he found the landing to be a deviation, albeit, insubstantial. We have the right to review this finding. *Stanley, supra.*

We may begin by observing that the October 28th trip to Lock Dam was beneficial to the Company since the purpose was to determine if the contract had been completed, so that the Company would be entitled to payment.

Did Adelbert's presence at Lock Dam serve the Company's interest? Again, because he had represented the Company during the progress of the work, had consulted with the Bangor Hydro-Electric Company's engineer, and had become aware of the Company's contractual responsibilities, the need for his knowledge at a "close-out" conference is obvious. In any event, Raymond must have recognized the need of Adelbert's presence because he took him on the trip and, instead of leaving him at Harrington Lake in the morning, demanded that he accompany him to. Lock Dam by saying to him, "let's get going."

Landing an airplane on water was a risk of Raymond's employment assumed by the Company. For example, if the fatal accident had occurred on either of the two landings at Lock Dam, or those at Greenville or "Telos," there would be no question about the plaintiff's right to compensation. We know from acts and statements of the decedent that these four landings were related to Company business. Likewise, if the landing at Harrington Lake had been successfully accomplished, and the fatal accident had occurred in the final landing at Ellsworth, liability would be clear.

On what evidence did the Commissioner draw the inference that the attempted landing at Harrington Lake was a deviation from Company business? The record only shows that the Company had no interest in the sporting camps, that Adelbert was the caretaker, that Mr. Ricker was working solely for Adelbert, and that Adelbert had agreed to have him flown back to Ellsworth on the 28th. We would agree, if the only purpose of the trip was to return Mr. Ricker to Ellsworth, that Raymond's act in landing on Harrington Lake would be a deviation from the course of his employment.

Our Court has considered situations where the employee, without prior knowledge or consent of his employer, did some act for a personal reason which exposed him to a risk not incidental to his employment. In these cases the Court found no causal connection between the employee's duties and the accident which caused his injury, and held that the accident did not arise out of his employment. Taylor's

Case (1927), 126 Me. 450, 139 A. 478; Saucier's Case (1923) 122 Me. 325, 119 A. 860; White v. Eastern Manufacturing Co. and American Mutual Liability Insurance Co. (1921), 120 Me. 62, 112 A. 841; Metcalf v. Marine Colloids, Inc., *supra*.

█ Likewise, when an employee deviates from his business route by taking a side trip which is clearly identifiable as such, he is unquestionably beyond the course of his employment while going away from the business route and toward the personal objective. Harris v. Industrial Comm. (1951), 72 Ariz. 197, 232 P.2d 846; State v. Russo (1951), 155 Ohio St. 341, 98 N.E.2d 830; see also Larou v. Table Talk Distributors, Inc. (1958), 153 Me. 504, 138 A.2d 475.

A common factor in these situations is that the employee, without prior knowledge or consent of the employer, either did some act for a personal reason unrelated to his employment, or, in carrying out his employment obligations, turned from the usual route expected of him, again for personal reasons non-beneficial to his employer. In either situation, an injury incurred while the employee is thus engaged in a personal activity does not arise out of and in the course of the employment and is non-compensable.

However, it does not follow that *all* injuries to an employee while engaging in a personal activity during the course of employment are non-compensable.

We have never before had occasion to consider the "dual purpose trip rule" in Maine.

"Injury during a trip which serves both a business and personal purpose is within the course of employment if the trip involves the performance of a service for the employer which would have caused the trip to be taken by someone even if it had not coincided with the personal journey."

1 Larson, Workmen's Compensation Law § 18.00.

This rule, "accepted by the great majority of jurisdictions," [3] was endorsed by Mr. Justice Cardozo in the leading case of Marks' Dependents v. Gray (1929), 251 N. Y. 90, 167 N.E. 181. In differentiating between compensable and non-compensable dual purpose trips, Larson, § 18.12, summarizes the majority rule in this language:

"[W]hen a trip serves both business and personal purposes, it is a personal trip if the trip would have been made in spite of the failure or absence of the business purpose and would have been dropped in the event of failure of the private purpose, though the business errand remain undone; it is a business trip if a trip of this kind would have been made in spite of the failure or absence of the private purpose, because the service to be performed for the employer would have caused the journey to be made by someone even if it had not coincided with the employee's personal journey."

Larson, § 19.21 illustrates the application of this rule graphically:

"§ 19.21 Direct route to both business and personal destination

The simplest pattern is that of the mixed-purpose trip in which the accident occurs while claimant is on his direct route to accomplish both a personal and a business objective.

*Pattern* A [4]

O —>—> # ..>..PE..>..ED [5]

This pattern is basically nothing but a straight mixed-purpose case, with the

---

3. Larson, *supra*, § 18.12, n. 25.

4. Key to diagram: O-origin of trip; #-point of accident; PE-personal errand; ED-employment destination.

5. Relating "Pattern A" to the facts before us, we envision the line of travel as the course between Chamberlain Lake and Ellsworth, "O" as Lock Dam, "#" as the point of accident; "PE" as the Harrington Lake camps, and "ED" as Ellsworth.

business and personal errands separated but on the same route. For example, a salesman was about to make a regular delivery to point ED, but on the way was going to drop his mother at her husband's store, which would be point PE. Under the principles discussed in the preceding section, the trip from O to PE, lying on the direct route to ED, is in the course of employment.[38] It is not segregated and treated as personal because the first intermediate destination happens to be the personal one."[6]

■ A fortiori, if an employee is injured during the personal aspect of a dual purpose trip which would have been made in spite of the failure or absence of the private purpose, the injury arises out of and in the course of the employment and the employee is not deviating from the course of his employment when so injured. Levy v. Levy's Bazaar, Inc. (1939), 257 App.Div. 885, 12 N.Y.S.2d 131; Cardwell v. Industrial Commission (1950), Ohio App., 98 N.E.2d 326.

■ Relating this rule to the facts before us, we feel that the Commissioner drew an impermissible inference when he found that the act of landing on Harrington Lake was a deviation from the course of Raymond's employment.

Was the trip of October 28th a "dual purpose trip"? Going back to the moment of "take-off" at Ellsworth, what was the purpose of the trip? What was Raymond Sargent's plan for the day? What would he do and where would he go before returning to Ellsworth? Since no witness was able to testify directly on these points, quoting Raymond, we must determine from the record what inferences are proper.

The following facts are clear:

1. The conference at Lock Dam on October 28th was a business necessity.

2. The date was agreed upon beforehand; i. e., prior to October 28th.

3. The presence of Raymond at Lock Dam served a Company purpose.

4. Raymond conceived that Adelbert's presence was also necessary as evidenced by:

A. The fact that Raymond took Adelbert on the trip.

B. That he issued the directive to Adelbert at Harrington Lake, "let's get going."

5. Harrington and Chamberlain Lakes lie on precisely the same course from Ellsworth.

6. Although Wilbur Ricker was engaged in a non-company related activity, it had been prearranged with Adelbert that he be flown out the 28th, and not the 29th, as Ricker would have preferred.

7. Raymond was aware of Mr. Ricker's presence at Harrington Lake and of his purpose for being there because:

A. The Company plane had flown him to Harrington Lake on the 27th.

B. The Company plane landed there on the morning of the 28th.

These facts support only one inference, namely, that the trip on October 28th was pre-planned to originate at Ellsworth in the morning and to include a landing on Harrington Lake en route to Lock Dam as well as a landing there en route from Lock Dam to Ellsworth, where the trip would terminate.

They support without qualification the inference that the October 28th trip was mandated primarily for a Company purpose, the finalizing and completion of the construction project with Bangor Hydro-Electric Company. The stop to pick up

6. In § 19.29 Larson comments, "if the trip as a whole was sufficiently motivated by the employment to be compensable on the way out, the same should be true of the journey back." Aetna Life Ins. Co. v. Schmiedeke (1927) 192 Wis. 574, 213 N.W. 292.

Mr. Ricker was a part of the plan from its inception, but subordinate to the main purpose. For example, if Mr. Ricker had not been at Harrington Lake, Raymond and Adelbert would still have flown to Lock Dam.

The facts meet the test spelled out by Mr. Justice Cardozo in *Marks'·Dependents, supra,* when he wrote: "To establish liability, the inference must be permissible that the trip would have been made though the private errand had been cancelled."

The finding of deviation by the Commissioner undoubtedly arose from looking at the trip in isolated segments and in failing to recognize that the landing at Harrington Lake was merely an incidental part of a pre-planned trip designed to serve a dual purpose. The facts are consistent with only one inference, namely, that Raymond's attempted landing on Harrington Lake was in the course of his employment.

Having determined that the fatal accident arose out of and in the course of the decedent's employment, it follows that the Commissioner's ultimate award of damages must be sustained, although for reasons other than those assigned. The presumption created by section 64–A is supported by the record which, conversely, entirely fails to meet the burden demanded of the employer under *Metcalf.*

The entry is:

Appeal denied. Ordered an allowance of $350.00 for fees and expenses of counsel to be paid by the employer to the employee.