Robert E. COMEAU

v.

MAINE COASTAL SERVICES and The
Travelers Insurance Company.

Supreme Judicial Court of Maine.

Argued Jan. 5, 1982.
Decided Aug. 17, 1982.

Campbell & Schmidt, Remington O. Schmidt (orally), Portland, for plaintiff.

Hewes Culley, Feehan & Beals, Thomas J. Quinn (orally), Portland, for defendants.

Before McKUSICK, C. J., and GODFREY, ROBERTS, CARTER, VIOLETTE and WATHEN, JJ.

ROBERTS, Justice.

In an unusual case on its facts, Robert Comeau appeals from a *pro forma* decree of the Superior Court affirming the decision of the Workers' Compensation Commission.

The Commission denied Comeau's Petition for Award of Compensation on the ground that the injury did not arise out of or in the course of the employment. Comeau was injured when he intervened in an assault upon Marge Warren, a non-employee, that occurred outside of his motel room in St. Albans, Vermont. Because Comeau has not demonstrated an erroneous application of the concept of work-connection, we affirm the denial of compensation.

## I. *Facts*

The parties do not dispute the historical facts. In March of 1979, Comeau went to St. Albans, Vermont, to perform services on behalf of his employer, Maine Coastal Services (Coastal). The job involved the relining of two tanks with epoxy for the Hood Milk Company (Hood). Two other individuals also went to St. Albans to work on this project, Robert Libby, a Coastal employee and Joseph Garvey, an employee of the epoxy manufacturer. Since both Libby and Garvey were under the supervision of Comeau during the course of this project, we treat them as co-workers for the purposes of this appeal. The work on the Hood project began on March 10, 1979. The project took several days to complete and the three men worked between sixteen and eighteen hours a day. During this period, they stayed in three separate rooms at the Cadillac Motel in St. Albans.

The project was essentially completed by the evening of March 24. In accord with the custom at Coastal upon the completion of a job, Comeau took his fellow workers, Lawrence Burger, who was the chief engineer of Hood, and Burger's wife out to dinner that night. Part of the reason for the dinner was to court additional business from Hood. The entire dinner bill was paid for by Coastal.

At the Colonial Restaurant, the dinner party was waited on by Marge Warren who later became the victim of the assault. Comeau, who previously did not know Ms. Warren, was not formally introduced to her "except to the extent of her stating or

someone stating her name." Following an uneventful dinner that was completed at approximately 11:00 p. m., and a brief stop at the Cadillac Motel, the entire dinner party went to the Outpost, a local discotheque.

The dinner party stayed at the Outpost until shortly after midnight. While there, they were joined by a number of other Hood employees as well as by their dinner waitress, Marge Warren. Comeau did not speak to Warren and spent most of the evening talking with Burger, in part about business. Garvey, however, sat next to Warren at the end of the table opposite from Comeau. The expenses at the disco were "Dutch Treat."

When they were leaving the Outpost, Garvey mentioned to Comeau that Warren had been beaten up or thrown around by someone. Comeau inquired whether the police had been called but, in general, tried to disassociate himself from what he viewed as a local problem.

The dinner party returned to the motel accompanied by Warren. Soon thereafter, Burger and his wife left to go home. Comeau inquired of Garvey if everything was all right and then went to bed. Warren went to Garvey's room to use his phone or bathroom. A few minutes later Comeau heard the loud screeching of tires and then Garvey pounding on his door. Garvey was seeking Comeau's assistance because a man, Ken Reitz, was "killing" Warren. Reitz had located Warren in Garvey's room and dragged her into the motel parking lot. Comeau and Garvey approached Reitz in the parking lot and Warren managed to struggle free. As the two men sought to calm Reitz, he pulled out a gun and hit Comeau over the head.

Comeau sought compensation for the injuries stemming from this incident. He filed both a Petition for Award of Compensation and a Petition to Determine the Extent of Permanent Impairment. The parties continued the latter petition pending a decision on the claim for compensation.

The Commissioner dismissed[1] the compensation petition in a decree dated November 5, 1980, on the ground that the injury did not arise out of or in the course of employment. Comeau moved for findings of fact and conclusions of law pursuant to 39 M.R.S.A. § 99 and the parties submitted proposed findings. The Commissioner then issued a subsequent decision extensively explaining the basis of his decision to deny the employee's Petition for Award of Compensation.[2]

## II. *Principles of Law*

The sole issue presented on appeal is whether the injuries sustained by Comeau arose out of and in the course of his employment with Coastal. Both the "arising out of" and the "in the course of" prongs of the coverage formula embodied in 39 M.R.S.A. § 51 are involved in the determination of the compensability of an injury under the Maine Workers' Compensation Act. *See Wing v. Cornwall Industries*, Me., 418 A.2d 177, 178 (1980); *Moreau v. Zayre Corp.*, Me., 408 A.2d 1289, 1292 (1979); *Wolfe v. Shorey*, Me., 290 A.2d 892, 893 (1972); *see also Mailman's Case*, 118 Me. 172, 180, 106 A. 606, 610 (1919).

In traditional parlance, the term "in the course of" employment relates to the time, place and circumstances under which the accident took place. *Moreau v. Zayre Corp.*, Me., 408 A.2d 1289, 1292 (1979); *Gilbert v. Maheux*, Me., 391 A.2d 1203, 1205 (1978); *Sullivan's Case*, 128 Me., 353, 357, 147 A. 431, 432 (1929); *Fournier's Case*, 120 Me. 236, 240, 113 A. 270, 271 (1921). "An accident arises in the course of employment when it occurs within the period of employment at a place where the employee reasonably may be in the performance of his duties and while he is fulfilling those duties or engaged in something incidental thereto." *Fournier's Case*, 120 Me. at 240, 113 A. at 272. *Accord Moreau v. Zayre Corp.*, 408 A.2d at 1293. As noted by Professor Larson, "[t]he course of employment requirement tests work-connection as to time, place and activity...."[3] 1 A. Larson, *Workmen's Compensation Law* § 14 at 4–1 (1978) (hereinafter referred to as Larson); *see Wing v. Cornwall Industries*, 418 A.2d at 179.

The legal criterion of "arising out of" the employment is customarily defined as meaning that "there must be some causal connection between the conditions under which the employee worked and the injury which arose, or that the injury, in some proximate way, had its origin, its source, its cause in the employment." *Barrett v. Herbert Engineering, Inc.*, Me., 371 A.2d 633, 636 (1977). *Accord Bruton v. City of Bath*, Me., 432 A.2d 390, 392 (1982); *Moreau v. Zayre Corp.*, 408 A.2d at 1292; *Ramsdell v. Naples*, Me., 393 A.2d 1352, 1354 (1978). The employment need not be the sole or predominant causal factor, *Richardson v. Robbins Lumber, Inc.*, Me., 379 A.2d 380, 382 (1977); *Oliver v. Wyandotte Industries Corp.*, Me., 360 A.2d 144, 147 (1976), and the causative circumstance "need not have been

---

**1.** As we have often stated, when a petition is decided on the merits it would be better form for the Commissioner to deny rather than to dismiss the petition. *E.g., Madore v. Bangor Roof & Sheet Metal Co.*, Me., 428 A.2d 1184, 1185 n.1 (1981); *White v. Forster Manufacturing Co.*, Me., 421 A.2d 55, 56 n.1 (1980); *Wing v. A. C. Electric Corp.*, Me., 408 A.2d 1006, 1007 n.1 (1979).

**2.** Although the Commissioner did not act on the petition for permanent impairment, the Superior Court's *pro forma* decree purports to deny that petition as well. The court had no power to act in this respect. *See Wilcox v. Stauffer Chemical Co.*, Me., 423 A.2d 241, 243 (1980). We are compelled, therefore, to vacate that part of the decree.

**3.** An activity is related to the employment if it carries out the employer's purposes or advances his interests directly or indirectly.... [E]ven if the activity cannot be said in any sense to advance the employer's interests, it may still be in the course of employment if, in view of the nature of the employment environment, the characteristics of human nature, and the customs or practices of the particular employment, the activity is in fact an inherent part of the conditions of that employment.

1A Larson, *supra* at § 20.00; *see, e.g., Bouchard v. Sargent, Inc.*, 152 Me. 207, 209, 127 A.2d 260, 261 (1956).

foreseen or expected," *Willette's Case*, 135 Me. 254, 256, 194 A. 540, 541 (1937) (quoting *Re McNicol*, 215 Mass. 497, 102 N.E. 697 (1913)); *see* 1 Larson, *supra* at § 6.60 (tort concept of foreseeability not an aspect of compensation law requirement of "arising out of" because culpability not at issue); Larson, *Range of Compensable Consequences in Workmen's Compensation,* 21 Hastings L.J. 609, 609–10 (1970).

■■■■ The statutory phrase "arising out of and in the course of employment" has been described as "deceptively simple and litigiously prolific." *Cardillo v. Liberty Mutual Insurance Co.,* 330 U.S. 469, 479, 67 S.Ct. 801, 807, 91 L.Ed. 1028, 1037 (1946). "Reams have been written undertaking to define and apply the simple, expressive requirement of the statute that, in order to be entitled to compensation, an employee must have received 'a personal injury . . . arising out of and in the course of his employment.'" *Hawkins v. Portland Gas Light Co.,* 141 Me. 288, 292–93, 43 A.2d 718, 719 (1945). Despite the difficulties of application, the purpose the coverage formula seeks to effectuate is simple and clear: "to compensate employees for injuries suffered *while* and *because* they were at work." *Bryant v. Masters Machine Co.,* Me., 444 A.2d 329, 333 (1982) (quoting *Canning v. State Department of Transportation,* Me., 347 A.2d 605, 608 (1975)). In short, when an injury is "work-related," *Richardson v. Robbins Lumber, Inc.,* 379 A.2d at 382, when it "in a just sense" relates to employment, *see Townsend v. Maine Bureau of Public Safety,* Me., 404 A.2d 1014, 1019 (1979); *Barrett v. Herbert Engineering, Inc.,* 371 A.2d at 636, compensation is forthcoming. Thus, those losses which can properly be said to be a consequence of industrial activity will be borne by the industry while those losses which are a consequence of life in general will be borne by the individual.

A proper analysis of the question of compensability requires harmonization of both components of the statutory rule and comprehensive analysis of all relevant considerations so as to determine whether a suffi-cient connection between the employment and the injury exists. While both elements of the rule set forth in section 51 must be considered by the Workers' Compensation Commission, the factors involved in the concept of work-connection are, in many cases, inextricably interrelated.

In *Waycott v. Beneficial Corp.,* Me., 400 A.2d 392 (1979), we observed that denial of compensation under the "public street" rule has found its basis under both the "arising out of" and the "in the course of" elements of section 51. Important to the instant discussion is the conclusion drawn by the *Waycott* court from that observation:

> [T]he ["public street"] rule is ultimately grounded in the notion that there is an insufficient connection with the employment context to warrant compensation for an injury occurring in such circumstances.
>
> Where there is a more significant relationship between injury and employment, we have not hesitated to compensate an off-premises accident.

*Waycott,* 400 A.2d at 394. Similarly, in *Brown v. Palmer Construction Co.,* Me., 295 A.2d 263 (1972), a decision noted in *Waycott* in support for its conclusion, the Law Court upheld an award of compensation to two employees injured when the stove exploded in the apartment they had rented near an out-of-state worksite. There we stated that the policy of the Compensation Act was "to protect the employee against risks which are not purely self-created but are created by and incidental to the employment." *Id.* at 266. In reaching its decision, the Court noted the necessity that the employee undertake lodging and meals near the worksite in order to accommodate the needs of the employer and the lack of any unreasonable risks or perils created by the employees in their choice of apartments. *Id.*

■■■■ The implication that can be drawn from these and other decisions is that when the fact pattern of a case does not fall snugly within the arising out of and in the course of employment requirement, closer analysis is required to ascertain whether a sufficient work-connection exists to justify

an award of compensation. Identification of rules and exceptions, while helpful, cannot substitute for an evaluation and weighing of all factors bearing on the ultimate question of work-connection. The diversity of analysis in our appellate opinions well illustrates the broad scope of this inquiry. We have in the past examined a variety of considerations including, but not limited to:

(1) Whether at the time of the injury the employee was promoting an interest of the employer or the activity of the employee directly or indirectly benefited the employer. *See Nadeau v. Town of South Berwick*, Me., 412 A.2d 392 (1980); *Cook v. Bangor Hydro-Electric Co.*, 402 A.2d 64 (1979); *Gilbert v. Maheux*, Me., 391 A.2d 1203 (1978); *McLaren v. Webber Hospital Association*, Me., 386 A.2d 734 (1978).

(2) Whether the activities of the employee work to the benefit or accommodate the needs of the employer. *See Blackman v. Harris Baking Co.*, Me., 407 A.2d 21 (1979); *Gilbert v. Maheux, supra; Brown v. Palmer Construction Co.*, Me., 295 A.2d 263 (1972).

(3) Whether the activities were within the terms, conditions or customs of the employment, or acquiesced in or permitted by the employer. *See Brown v. Palmer Construction Co., supra; Metcalf v. Marine Colloids, Inc.*, Me., 285 A.2d 367 (1972); *Bouchard v. Sargent, Inc.*, 152 Me. 207, 127 A.2d 260 (1956); *Chapman v. Hector J. Cyr Co.*, 135 Me. 416, 198 A. 736 (1938).

(4) Whether the activity of the employee serves both a business and personal purpose, or represents an insubstantial deviation from the employment. *See Sargent v. Raymond F. Sargent, Inc.*, Me., 295 A.2d 35 (1972); *Larou v. Table Talk Distributors, Inc.*, 153 Me. 504, 136 A.2d 475 (1958).

(5) Whether the hazard or causative condition can be viewed as employer or employee created. *See Chase v. White Elephant Restaurant*, Me., 418 A.2d 175 (1980); *Ramsdell v. Naples*,

Me., 393 A.2d 1352 (1978); *Oliver v. Wyandotte Industries Corp.*, Me., 360 A.2d 144 (1976).

(6) Whether the actions of the employee were unreasonably reckless or created excessive risks or perils. *See* 39 M.R.S.A. §§ 3, 61; *Geel v. Graham Brothers*, Me., 430 A.2d 1112 (1981); *Wing v. Cornwall Industries*, Me., 418 A.2d 177 (1980); *Gilbert v. Maheux, supra; Brown v. Palmer Construction Co., supra; Bennett's Case*, 140 Me. 49, 33 A.2d 799 (1943).

(7) Whether the activities of the employee incidental to the employment were prohibited by the employer either expressly or implicitly. *See Babine v. Lane Construction Co.*, 153 Me. 339, 138 A.2d 625 (1958); *Fournier's Case*, 120 Me. 236, 113 A. 270 (1921).

(8) Whether the injury occurred on the premises of the employer. *Getchell v. Lane Construction Co.*, 153 Me. 335, 138 A.2d 629 (1958); *Babine v. Lane Construction Co., supra.*

These considerations as well as others do not create a dispositive checklist; rather, they are but factors on the scale weighing toward or against a finding that the injury arose out of and in the course of employment. While one factor may not be solely determinative, strong evidence on one aspect of work-connection may sometimes support an award of compensation despite contrary evidence relating to other considerations. The crucial question is whether a sufficient work-connection has been exhibited so as to justify an award of compensation under a liberal interpretation of this remedial Act. *See Clark v. DeCoster Egg Farms*, Me., 421 A.2d 939, 942 (1980) (Act is remedial in nature and is to be so construed to accomplish its beneficent purposes and avoid incongruous and harsh results).

III. *Application of Legal Principles*

In the instant case, the Commissioner followed up his detailed discussion of the facts with separate conclusions based on those facts. His ultimate decision was that "[t]he injury was approximately [sic] produced by

the employee's own voluntary acts and had nothing to do with the conditions of his employment." On appeal Comeau challenges these conclusions of the Commissioner and lists a number of facts which he says establish that the injury arose out of and in the course of the employment. Noting court decisions pertaining to travelling employees, assaults, positional risk, dual purpose activities and rescues, the employee contends that given the facts and applicable law, the Commissioner erred in his dismissal of the employee's Petition for Award of Compensation.

As noted in Part II of this opinion, resolution of the issue of whether an injury arose out of and in the course of employment requires the examination and weighing of a number of factors in order to ascertain whether a sufficient work-connection exists. In light of the decisional range afforded by such an inquiry and the special expertise of the Commissioner in the area of compensation law, we typically pay special deference to the findings of the Commissioner. *See Timberlake v. Frigon & Frigon*, Me., 438 A.2d 1294, 1295–96 (1982); *Wing v. Cornwall Industries*, 418 A.2d at 180–81. Our role on appeal is "limited to assuring that the Commissioner's factual findings are supported by competent evidence, that his decision involved no misconception of applicable law and that the application of the law to the facts was neither arbitrary nor without rational foundation." *Hall v. State*, Me., 441 A.2d 1019, 1021 (1982); *see Dunton v. Eastern Fine Paper Co.*, Me., 423 A.2d 512 (1980); *Wing v. Cornwall Industries*, 418 A.2d at 180–81. Under this standard of review, we are compelled to affirm the decision of the Commissioner because his weighing of the factors here presented was "neither arbitrary nor without rational foundation."

To illustrate the process by which a Commissioner may properly weigh the considerations for and against a finding of work-connection, we comment briefly on some of Comeau's contentions. Comeau suggests that Warren and her assailant "became part of petitioner's life only because of the business dinner." This circumstance is relevant to the issue of work-connection but, nevertheless, only invokes a somewhat tenuous employment relationship based upon a casual contact which was neither peculiar to nor a necessary adjunct of job-related activities. While Comeau was "drawn" into the situation by Garvey, Garvey's involvement itself was no more job-related than Comeau's "casual contact" and any evidence that Garvey himself was exposed to danger was not compelling. Even though the assault took place in close proximity to the motel room where Comeau stopped during his business trips, the assault was not an unavoidable calamity such as a fire or explosion at the motel. We do not suggest that any of the countervailing considerations are necessarily dispositive. Rather, we use them as examples of the judgmental evaluation which is exclusively within the province of the Commissioner.

Our review in the present case, however, is complicated by the absence of any explicit discussion by the Commissioner of the concept of emergency or rescue activity by an employee. Although we have never expressly adopted that concept, Professor Larson has described its content as follows:

> Any emergency or rescue activity is within the course of employment if the employer has an interest in the rescue. Injury incurred in the rescue of a stranger is compensable if the conditions of employment place claimant in a position which requires him by ordinary standards of humanity to undertake the rescue.

1A Larson, *supra* at § 28.00. The significance of this concept is that it removes the activity of an employee in an emergency situation not entirely of his own making from the realm of strictly employee-oriented activity (1) if the activity is at all in furtherance of the employer's interests or (2) if ordinary standards of humanity required the employee to act when placed in the situation by the conditions of employment.

In our view of the case before us, the Commissioner was not compelled to give

substantial weight to the rescue aspect advanced by the employee. Any risk of harm to Garvey was not sufficient to require a finding of employer interest in a rescue. Regardless of whether "ordinary standards of humanity" would require Comeau's intervention on behalf of Warren (a question the Commissioner did not address), we discern no compelling evidence that the conditions of his employment placed Comeau in a position of exposure to the confrontation in the motel yard. We must, therefore, accept the Commissioner's ultimate conclusion that the eventual injury "had nothing to do with the conditions of his employment."

As we indicated in Part II of this opinion, the question of compensability can be complex when, as here, the facts do not fit into a typical pattern. Our task is not to determine whether the Commissioner reached the only correct conclusion but rather, whether his conclusion is permissible on the record before us. Comeau "can prevail only if legal error is evident in the decree." *Morton v. Greater Portland Transit District,* Me., 440 A.2d 8, 10 (1982). Since we find no such error we must affirm the denial of compensation.

The entry is:

The *pro forma* decree of the Superior Court denying the Petition for Permanent Impairment is vacated.

The *pro forma* decree of the Superior Court denying the Petition for Award of Compensation is affirmed.

It is further ordered that employer pay to the employee an allowance for counsel fees in the amount of $550 together with his reasonable out-of-pocket expenses for this appeal.

McKUSICK, C. J., and GODFREY, CARTER, VIOLETTE and WATHEN, JJ., concurring.

CARTER, Justice, concurring.

The Court's opinion reformulates the established Maine law of work-connection to be applied under the statutorily articulated standard that, to be compensable, an injury must be one "arising out of and in the course of employment." 39 M.R.S.A. § 51. Although the opinion studiously avoids the use of the term, it undeniably adopts, for the first time in the law of Maine, the so-called "quantum theory" of work-connection. *See* 1A Larson, *The Law of Workmen's Compensation* § 29 (1979). Though I agree with the result ultimately reached by the majority, I must vigorously express disagreement with what I think to be so unwise and unwarranted a course of judicial revision of established law.

The "quantum theory" of work-connection holds that the "course and arising" components of the statutory formula for determination of work-connection are simply "separate headings for convenience," *id.* at 5–354: that "both are parts of a *single test* of work-connection, and therefore deficiencies in the strength of one factor are sometimes allowed to be made up by strength in the other." *Id.* (emphasis added)[1] The effect of this abstract construct is to reduce greatly the rigors of the statutory test of work-connection. Its principal thrust is to permit a finding of work-con-

---

1. That the adoption of the "quantum theory" is the result of the Court's opinion is clearly displayed by the language there used. It is said that (1) "[a] proper analysis of the question of compensability requires *harmonization* of both components of the statutory rule and comprehensive analysis of all relevant considerations so as to determine whether a *sufficient connection* between the employment and the injury exists" 449 A.2d at 366 (emphasis added); (2) both elements of the rule "are, in many cases, inextricably interrelated," 449 A.2d at 366; (3) an "implication" can be drawn from cited Maine cases that "... when the fact pattern of a case does not fall snugly within the arising out of and in the course of employment requirement, closer analysis is required to ascertain whether a sufficient work-connection exists to justify an award of compensation" 449 A.2d at 366; (4) those factual propositions that have in the past been the basis for our application of the test "do not create a dispositive checklist; rather, they are but factors on the scale weighing toward or against a finding" of work-connection (at 367); and (5) "[w]hile one factor may not be solely determinative, strong evidence on one aspect of work-connection may sometimes support an award of compensation despite contrary evidence relating to other considerations" (at 367).

nection where the evidentiary proof fails to satisfy, as a substantively discrete analytical entity, either the "course" or "arising" components of the test. For that reason, the "quantum theory" functions to accomplish an enormous expansion of the parameters of the work-connection test as that has long been articulated by this Court.

I would point out that the section 51 concept of work-connection frames more potently than any other provision of the Workers' Compensation Act the outer boundaries of the legislative policy judgments underlying the Act. The application of this provision determines those injuries that are to be subject to compensation under the Act. An injury that cannot meet the requirements of the standards there laid down does not qualify as compensable under the Act.

Under our cases, in order for a worker to be entitled to an award of compensation, it must be established *both* that his injury is sustained "in the course of" and that it "arise out of" his employment. 39 M.R.S.A. § 51. *Wing v. Cornwall Industries*, Me., 418 A.2d 177, 178 (1980); *Moreau v. Zayre Corp.*, Me., 408 A.2d 1289, 1292 (1979); *Wolfe v. Shorey*, Me., 290 A.2d 892, 893 (1972). The burden of producing proof sufficient to satisfy these requirements is on the employee. *Cardello v. Mt. Hermon Ski Area, Inc.*, Me., 372 A.2d 579, 581 (1977); *Wolfe*, 290 A.2d at 893. These requirements are distinct legal criteria. *Gilbert v. Maheux*, Me., 391 A.2d 1203, 1205 (1978). The "arising out of" requirement means that the injury must have "in some proximate way" its "origin, its source, its cause in the employment." *Id.* This test is primarily concerned with the existence of a causal connection between the employment and the injury in question. 1 Larson, *supra* at § 6. It requires "a showing that the injury was caused by an increased risk to which claimant, as distinct from the general public, was subjected by his employment." *Id.* at 3–1. See *Bryant v. Masters Machine Co.*, Me., 444 A.2d 329, 337 (1982).

The requirement that the injury be sustained "in the course of" the employment has a different thrust. It "directs attention basically to the temporal and spatial circumstances of the worker's sustaining of injury." *Wing*, 418 A.2d at 179; *see Moreau*, 408 A.2d at 1292; *Blackman v. Harris Baking Co.*, Me., 407 A.2d 21, 23 (1979). It requires proof and an ultimate determination that the employee sustained his injury at a time and place reasonably within the requirements of the performance of his work-related duties. *Fournier's Case*, 120 Me. 236, 113 A. 270 (1921). Accordingly, we have said:

> It is, therefore, not enough to justify an award of compensation that the general employment situation has *causal relation* to a worker's injury, so that the injury may be said to "arise out of" the employment; it is further requisite that the sustaining of injury be *particularly tied to a time, a place and the performance of employment duties, or the incidents thereof*, such that the injury may be found to have originated "in the course of" employment.

*Wing*, 418 A.2d at 179 (emphasis added).

These two statutory requirements under prior Maine law have been taken to be discrete elements of a general statutory test of work-connection which is broader than either of them taken individually. See *Wing*, 418 A.2d at 178–79. Our cases have maintained a very strict compartmentalization of the two requirements for purposes of analysis. See *Wing*, 418 A.2d 177 (1980); *Moreau*, 408 A.2d 1289 (1979); *Blackman*, 407 A.2d 21 (1979); *Gilbert*, 391 A.2d 1203 (1978); *Wolfe*, 290 A.2d 892 (1972); *Boyce's Case*, 146 Me. 335, 81 A.2d 670 (1951); *Sullivan's Case*, 128 Me. 353, 147 A. 431 (1929); *Gray's Case*, 123 Me. 86, 121 A. 556 (1923); *Mailman's Case*, 118 Me. 172, 106 A. 606 (1919). As we have said very recently:

> [I]t was not intended that compensation should issue for every disability resulting from an injury sustained *while* the employee was at work, but only for a disability as to which the precipitating injury was additionally sustained *because* of the employee's work.

*Bryant*, 444 A.2d at 334 (emphasis in original).

I believe, for a variety of reasons, that it is unwise for us to abandon these established principles which have evolved in our case law over a period of at least sixty years. First of all, applying the standard of work-connection established under the Act, we are charged with construing and applying the statutory language to accomplish the underlying legislative intent.[2] The cited Maine case law thus represents the Court's determination of the Maine Legislature's intent in enacting section 51. That intent, we have said, is that to be compensable an injury must meet *both* the requirement of proximate causality, on the one hand, and that of spatial and temporal relationship to the circumstances of employment, on the other. I cannot find any indication that the Legislature has ever demurred from our construction of this language or expressed dissent from the determination of legislative intent which that construction implements as the law of this State. There is nothing of recent occurrence to indicate that the Legislature has departed from its intent, so construed and so determined. How, then, can we suddenly posit a loosening of the strictures of the established test of work-connection in construing long-standing statutory language?[3] There has been no showing of injustice in the workings of the established standard of work-connection. *Cf. Myrick v. James,* Me., 444 A.2d 987, 1000 (1982). There has occurred no sharp shift in societal conditions or legal needs demonstrating any compulsion for a more liberal standard. *Id.* at 998. There has been no erosion of legal princi-

**2.** The broader factual considerations that potentially underlie the legislative formulation of the work-connection test require an informed application of not only the most wide-ranging principles of social policy but also of important considerations of economic policy. All of these principles and considerations are peculiarly within the arena of legislative purpose and function, not to mention expertise, and are uniquely beyond, for purposes of accurate analysis, the informational resources, expertise and proper function of the judiciary. The social and economic equation that yields the work-connection test subsumes the resolution of so many issues of such delicate balance and supreme technicality that the potential for error, if not harm, in any revision of it is staggering. Thus, any such revision of its content should be left to the Legislature, which can, at least, assess the magnitude of potential error in those changes it chooses to make and move expeditiously to correct any error resulting from them as soon as it is perceived to be of significance in terms of adverse impact upon legislatively determined policy goals.

**3.** The majority suggests that such a revision of the standard is required because "the factors involved in the concept of work-connection are, in many cases, inextricably interrelated." 449 A.2d at 366. Such, I suggest, is not in reality the case at all. First, to the extent that the two criteria are interrelated, that has not, for at least the last sixty years, proven to be any significant barrier to purposeful and integrated application of the policy principles underlying section 51 of the Act to particular fact situations. This Court has never before complained of, or even noted, any great difficulty in extricating one factor from another in making work-connection analyses nor in exploring and exploiting the consequences of any discernible interrelationships that may exist between them. I have not had pointed out to me, nor can I visualize, any reason why, on this occasion, our capacity for such reasoned application of these principles is suddenly forestalled.

Second, to the extent that the majority means to suggest that some insuperable barrier to analysis exists because some facts may be relevant to the satisfaction of both criteria, it takes too simplistic a view of the work-connection analysis. It is thoroughly appropriate and wholly to be expected that in exploring complex issues of causality and of temporal-spatial relationship, some factual considerations bearing on employment conditions, scope of duties, circumstances of injury, and medical opinions of the likelihood of aggravating pre-existing physical conditions should have some relevance to causality and, at the same time, some relevance to temporal-spatial relation of injury to employment. That should not prove to be any great obstacle to discrete application of the two legal criteria. The relevance of the common facts will in each instance be different, because the inquiry is different. In the first instance, the facts are examined for the significance they have in determining the existence of a causal connection between injury and employment. In the latter instance, the same facts may be sometimes relevant for their significance in establishing the requisite link in space and time between injury and employment. I do not find that such a duality of significance to distinguishable inquiries creates any obstacle to effective analysis. Even if it were to do so, the difficulty of analysis, alone, does not justify the destruction of the mandated tools of analysis.

ples or precedent showing the existing standard to be obsolete, unworkable or productive of unjust results. *Id.* at 999. There seems to me to be no basis to believe that this judicial redefinition of one of the most important parts of the Workers' Compensation Act is appropriate or justifiable. *Nisi fractus est, ne repares.*

Second, even assuming that there was a demonstrable need for a new standard of work-connection and that the judicial, rather than the legislative, imposition of a new standard could be analytically justified, the "quantum theory" is an unsound standard to substitute for the old one for two reasons: (1) it provides no standard of ascertainable substantive content for application at the commission level, and (2) under our existing standard of appellate review, its application by the commission will not be susceptible of meaningful review on appeal.

The primary advantage of the existing standard is that it segregates, for purposes of analysis of a specific case, considerations of causality (which involve both the determination of fact and the application of legal principle) from considerations of the time-space relationship of the injury to the employment (which primarily involve the determination of facts). Causality considerations require a definition of the nature and scope of the risk, exposure to which resulted in the employee's injury. It must then be determined whether that risk is one to which the employee is exposed because of his employment. This latter determination is accomplished only by searching out legal principles which serve to define as a matter of policy those hazards that are sufficiently connected to the employment to bring their compensability within the policy goals of section 51 of the Act. The facts of the specific case, as they bear on the relationship between work activity and origination of the injury, must then be found and legal principles applied to them to determine if the injury "arises out of" the employment as a matter of legal cause. If, by this procedure, it is found that the injury does not "arise out of," that is, that the injury is not legally and factually caused by the employment or some work-related circumstance or activity, clearly the injury is not intended to be compensated for under the Act.

If, on the other hand, the showing of causal connection between the injury and the employment is made out, it must then be determined if the causally connected injury occurred at a time when and at a place where the employee could reasonably be expected to be in the course of his employment. At this step, the analyst seeks to resolve a substantially different question than that of causality: assuming that the injury was caused by circumstances or activities of the employment, did it occur at a time and place that the employee was "in the course of his employment?" Professor Larson has succinctly stated the policy components of this aspect of the work-connection issue:

> It has been well established for many years that work-connection activity goes beyond the direct services performed for the employer and includes at least some ministration to the personal comfort and human wants of the employee. It would be inhuman to snatch away compensation protection from a workman each time he takes a momentary rest from his exertions. On the other hand, one can hardly justify an award to a workman who has been sleeping all day instead of working. *The problem is to define a principle which will tell us where the line is to be drawn.*

1A Larson, *supra*, § 20 at 5-1—5-2 (emphasis added). That principle is one of the space-time relation existent between the employment producing the injury and the circumstances of the injury. *Wing*, 418 A.2d at 179. It focuses upon whether the injury "occurs within the period of the employment at a place where the employee reasonably may be in the performance of his duties...." *Fournier's Case*, 120 Me. at 240, 113 A. at 272. This is a question separate and apart from that of whether the employment caused or brought about the injury. Even if causal connection is demonstrated, the statutory language requires a showing that that cause acted on *this* employee at a time and place when he

was within the course of *his* employment. Thus, the "cause" and "arising" requirements are properly to be treated as analytically distinct criteria to test for work-connection within the purposive meaning of the Act.

The "quantum theory" destroys this compartmentalization, both for purposes of conceptualization and of application, of these analytically distinct criteria. It permits—indeed it requires—the Commissioner to apply them as counterbalancing factors in a loosely-structured format of factors without any articulate guidelines or discernible standards by which he can measure an appropriate level of compliance with either criterion in any fact situation. The process of weighing the level of compliance with one criterion against the level of compliance with the other must necessarily be largely judgmental. Such judgmental comparisons, even if capable of articulation (and in most cases they would not be), would seldom, if ever, be susceptible of objective evaluation and demonstration of error on appellate review.

Under such a standard of work-connection, the Commissioner's untrammelled discretion, as shaped by his personal values and philosophical views, becomes the dispositive factor in determining issues of work-connection. The decision is thus not subject to testing by any objective standard that segregates the discrete impact in the decisional process of separable considerations of causal relation and of temporal and spatial connection. The standard of work-connection thus becomes a ball of fluff for analytical purposes. The only prospect of meaningful review would become that of *de novo* . review, which we have recently abjured. *See Hall v. State*, Me., 441 A.2d 1019, 1021 (1982); *Dunton v. Eastern Fine Paper Co.*, Me., 423 A.2d 512, 514–16 (1980). The Appellate Division of the Commission has very recently adopted this principle; "The Division will not independently review the record and substitute its judgment of the facts for those of the commissioner who heard the evidence and saw the witnesses." *Chapman v. Bath Iron Works*, Decision No. 82–03, slip op. at 2 (Me. Worker's Comp. Comm.App.Div., June 29, 1982).

Because I am convinced that nothing would do greater harm to the fair administration of the Workers' Compensation Act than *de novo* determination on appeal of such technical and intricately factual issues as work-connection, I vigorously object to this adoption of a standard of work-connection that will permit no other meaningful methodology of review. The "quantum theory," by leaving exclusively to commissioners the full determination on work-connection issues, is in sharp contradiction to the statutory mandate that appellate review be available. 39 M.R.S.A. §§ 103–B, 103–C. Because decisions on work-connection issues are subject to appellate review, we are obliged to provide meaningful review. In order to do that, we must articulate standards of substantive law that are capable of principled application by the commissioners and that provide a basis for objective review. The "quantum theory" prohibits the maintenance of any functionally effective environment for such application or review.

I would affirm the Commissioner's decision here "[b]ecause the Commissioner's decision involved no misconception of applicable law and his application of this law was neither arbitrary nor without rationale foundation." *Hall*, 441 A.2d at 1022. The majority's expansion of the work-connection test is therefore unnecessary, unwarranted and unwise.