Cheryl D. BONNEY, Plaintiff,

v.

CANADIAN NATIONAL RAILWAY COMPANY, Defendant.

Civ. No. 83–0039 P.

United States District Court,
D. Maine.

July 18, 1985.

---

Jack H. Simmons, William D. Robitzek, Berman, Simmons & Goldberg, Lewiston, Me., for plaintiff.

John H. Montgomery, Michael A. Nelson, Jensen, Baird, Gardner & Henry, Portland, Me., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND OPINION

GENE CARTER, District Judge.

### I. *Background*

This is a tort action brought by Plaintiff Cheryl Bonney against Defendant Canadian National Railway. Plaintiff seeks damages for the death of her husband, Rodney Bonney, which resulted from his attempt to rescue a fifteen-year-old boy who fell from a railroad bridge under the control of Defendant.[1] Jurisdiction is founded upon diversity of citizenship; the parties agree that Maine law applies. The action was tried to the Court, without jury, on June 19 and 20, 1985. The parties have stipulated to the admission of numerous depositions and exhibits, and they have also stipulated to many of the material facts.[2]

The following narrative is in large part excerpted from the parties' Agreed Statement of Facts.

During the late afternoon hours of April 6, 1981, Jonathan Thibodeau, then fifteen years of age, left his home in Lewiston to join his mother, who was visiting a friend, Robert Goyette, in Auburn. The cities of Auburn and Lewiston are separated by the Androscoggin River; it is thus necessary to cross a bridge to get from one city to the other. The shortest route between Jonathan Thibodeau's home and his destination was a railroad bridge leased by Defendant Canadian National Railway (the railroad).

The bridge is a concrete and steel structure built early in this century as part of a spur which comes to an end a short distance after it crosses the river into Lewiston. The bridge is approximately 410 feet long, and the tracks are about fifty feet above the surface of the river. The tracks sit on railroad ties which are fastened to the steel superstructure several inches apart from one another. The ties extend approximately three feet on either side of the tracks. Apart from widely spaced vertical and diagonal steel supports, there is nothing on either side of the ties to prevent a pedestrian from falling off the bridge into the river below.

A bridge designed to accommodate automobiles and pedestrians is located a short distance downstream from the railroad bridge. Thibodeau, like many residents of the area, was in the habit, however, of crossing by means of the railroad bridge, which saved him about ten to fifteen minutes travel time.

Throughout the late afternoon and evening hours Jonathan Thibodeau was in the company of his friend, Mark Sheink. Thibodeau walked, and Sheink rode Thibodeau's bicycle, across the trestle in the middle of the tracks. They arrived at the Goyette residence in Auburn at dusk. In addition to his mother and Goyette, two of Thibodeau's brothers, Clay and Timothy, were present.

At some time after dark, Thibodeau decided to return to his home in Lewiston to feed his kitten. He asked his mother for a dollar with which to buy the cat food.

Mrs. Thibodeau had admonished her son against riding his bike across the trestle

---

1. The boy, Jonathan Thibodeau, also died after the rescue attempt failed. His mother, Gladys Thibodeau, also brought an action against the railroad, but her claims were settled before trial.

2. The bulk of the record in this case consists of deposition testimony and exhibits which the parties have stipulated should be admitted. The parties also submitted an Agreed Statement of Facts.

some months before. A school mate of Thibodeau's had died approximately eight months prior to Thibodeau's accident after falling off a Maine Central Railroad bridge while attempting to ride a bike across it. Thibodeau was aware of this accident. Clay and Timothy Thibodeau also warned Thibodeau not to cross the trestle on his bicycle.

Thibodeau and Sheink retraced their earlier route while heading home. Thibodeau rode the bicycle up to the entrance of the trestle, while Sheink walked alongside. The area was dark and unlit except for a single light at a nearby bottle redemption center. The light was so dim that Sheink could not see whether anything was written on the trestle. Upon reaching the trestle, Thibodeau mounted his bicycle and placed the tires outside the rails on the right (downriver) side.

Thibodeau told Sheink that he was going to ride the bicycle across the bridge, outside the tracks. Sheink warned him not to, saying, "You're fucking crazy if you do that.... You're going to fucking die." Deposition of Mark Sheink at 24. Ignoring Sheink's advice, Thibodeau rode off ahead. Sheink began walking across the trestle, his eyes cast downward to watch his footing so that he would not step into the spaces between the ties. Sheink then heard a "cathump" and, after a pause, a splash. He then heard Thibodeau's cries for help from the river below.

Sheink ran back to a nearby variety store to have the police called. He then ran back to the Goyette residence and alerted the Thibodeau family. Gladys Thibodeau, together with her sons Clay and Timothy, raced to the accident scene.

The variety store owner called the police. Several officers went to the site in response to a radio call. The first to arrive was Rodney Bonney, a uniformed patrolman with the Auburn Police Department. He was accompanied by Detective Michael Morin. Neither Officer Bonney's car nor any other police car which arrived on the scene contained a rope or any other water rescue equipment. Officer Bonney ran down the embankment to the base of the bridge. He there encountered Clay Thibodeau who had waded into the water in an attempt to save his brother. Unfortunately, Clay was unable to swim. Officer Bonney removed his gun belt and other equipment and dove into the water. He swam to Thibodeau.

Other Auburn police officers arrived at the scene, including Officer Perino. Realizing that Officer Bonney and Jonathan Thibodeau were in distress, Officer Perino, a trained lifeguard with considerable lifesaving experience, removed his equipment and dove into the water. Perino reached the area in the river where Officer Bonney and Thibodeau were. Officer Bonney then pushed Thibodeau to Perino, who attempted to bring the youth back to shore.

At some time when both Officers Perino and Bonney were in the water, the Auburn Fire Department arrived with search lights and a rope. Sheink ran back up the embankment in an attempt to hurry the firemen along. Grabbing the rope from the firemen, Sheink ran down the bank. Meanwhile, in the river, Officer Perino, fast losing his strength in the extremely cold water, struggled to get Thibodeau ashore. He lost his grip on him and Thibodeau was swept away. Officer Perino managed to grab the rope which the fire department had brought and, although blinded by the lights set up by the fire department, was able to reach the shore. Officer Bonney was unable to reach the river bank and was swept away. Both Officer Bonney and Jonathan Thibodeau were drowned. Their bodies were recovered the next morning.

## II. *Liability*

The parties have agreed to most of the material facts in this case. Their dispute centers on the law to be applied to determining whether the railroad should be held liable for Bonney's death.

### A. *Status of Thibodeau*

◼ Plaintiff first argues that Thibodeau was a licensee to whom, under the case of *Poulin v. Colby College*, 402 A.2d 846 (Me.1979), the railroad owed a duty of

ordinary care. Plaintiff correctly maintains that the Court did not directly address the question as to whether Thibodeau was a licensee, as distinguished from a trespasser, in its decision on Defendant's Motion for Summary Judgment. In his Recommended Decision on Defendant's Motion for Summary Judgment, adopted by this Court, the Magistrate stated:

> I have concluded that Thibodeau was a trespasser or at most a bare licensee to whom the railroad owed no duty of care under Maine common law. . . .

Report and Recommended Decision on Defendant's Motion to Dismiss or in the Alternative for Summary Judgment, at 14. This statement is incorrect to the extent that it declares that the railroad owed no duty of due care to a "bare licensee." This rule was abandoned by the Maine Supreme Judicial Court in *Poulin, supra,* in which the Court announced that a possessor of land owes the same duty to a licensee as to an invitee, that is, a duty of ordinary care.

■ A licensee differs from a trespasser in that he is lawfully on the premises by virtue of the possessor's express or implied consent. Restatement (Second) of Torts § 330 (1965). " 'A licensee is a person who is neither a passenger, servant, nor trespasser, and not standing in any contractual relation with the owner of the premises, and is permitted to come upon the premises for his own interest, convenience, or gratification.' " *Patten v. Bartlett,* 111 Me. 409, 412, 89 A. 375 (1914) (*quoting* 29 Cyc., 451). The comment to section 530 of the Restatement of Torts, *supra,* explains:

> A mere failure to object to another's entry may be a sufficient indication or manifestation of consent, if the possessor knows of the other's intention to enter, and has reason to believe that his objection is likely to be effective in preventing the other from coming. On the other hand, the fact that the possessor knows of the intention to enter and does not prevent it is not necessarily a manifesta-

tion of consent, and therefore is not necessarily permission. A failure to take burdensome and expensive precautions against intrusion manifests only an unwillingness to go to the trouble and expense of preventing others from trespassing on the land, and indicates only toleration of the practically unavoidable, rather than consent to the entry as licensee. Even a failure to post a notice warning the public not to trespass cannot reasonably be construed as an expression of consent to the intrusion of persons who habitually and notoriously disregard such notices.

*Id.,* comment c. Dean Prosser has stated:

> [I]t is generally agreed that the mere toleration of continued intrusion where objection or interference would be burdensome or likely to be futile, as in the case of habitual trespasses on railroad tracks, is not in itself and without more a manifestation of consent.

Prosser, Law of Torts 378 (4th ed. 1971).

■ The issue, in short, is whether persons using the railroad bridge reasonably believed that the railroad consented to its use. The long history of heavy public use of the bridge would suggest to a reasonable person that the railroad acquiesced to such use. The railroad, however, posted "No Trespassing" signs, which suggested its lack of consent to public use. These were often removed by vandals, and no sign was posted the day Thibodeau fell off the bridge. The railroad did nothing to the bridge to make it more conducive to pedestrian use. More effective means of preventing pedestrian use, such as erection of a barrier gate, would have been, to a certain degree, burdensome.[3] The Court finds that the railroad did tolerate the known public use of the bridge; it did nothing effective to deter it. Members of the public, however, although they knew they could use the bridge with impunity, could not have reasonably believed that the rail-

---

**3.** The Court does not find, however, that such measures would have been futile. *See infra,* Part II.A. of this Opinion.

road consented to such use. They were not licensees, but were trespassers.

### B. *Willful, Wanton or Reckless Conduct*

■ Under Maine law, a possessor of land owes no duty of ordinary care to a trespasser, but only a duty to refrain from wanton, willful or reckless conduct.

The railroad argues that it cannot be held liable to the rescuer, Bonney, unless it breached a duty to the rescued party, Thibodeau. Since the railroad was not "willful, wanton or reckless" as to Thibodeau, that is, Thibodeau's predicament was not caused by the railroad's breach of duty, the railroad argues, it cannot be held liable to the party who attempted his rescue.[4]

Plaintiff argues that the railroad did breach its duty to refrain from willful, wanton or reckless conduct, and that therefore the railroad's breach of duty was the cause of the incident inviting Bonney's rescue attempt. Even if the railroad did not breach a duty owed to Thibodeau, Plaintiff contends that the railroad breached a duty owed directly to the rescuer, Bonney, irrespective of the existence of a legal obligation on its part owing to Thibodeau.

The facts bearing upon the existence of willful, wanton or reckless conduct by the railroad are largely undisputed. It was common knowledge in Lewiston and Auburn that the bridge was frequently used by pedestrians. In particular, the bridge was frequently used by residents of Auburn to walk to and from their jobs at

factories on the Lewiston bank of the river. The deposition testimony of several Railroad employees amply demonstrates that the railroad was fully aware of the extent of pedestrian use of the bridge. Robert A. P. Sweeney, a corporate witness for the railroad with respect to the inspection, maintenance, and safety of the bridge, was an engineer of bridge assessment who had authority over the bridge from 1969 to June 1980. Deposition of Sweeney at 4–6. He testified that he visited the bridge in June of 1966 and saw "20 to 25 kids" going across the bridge, including one bicyclist who rode across. *Id.* at 56, 79. On another occasion he saw a child ride a bicycle across the top of the steel framework of the bridge. *Id.* at 57.

Norman Chagnon was section foreman for the Auburn-Lewiston spur from 1977 to 1984. Deposition of Norman Chagnon at 10. An Auburn native, he crossed the bridge about a dozen times when he was a "kid." He noted that there is "a lot of [pedestrian] traffic" over the bridge, including "winos" and young adults coming from the bars at night. *Id.* at 33.

Louis Payeur, a building and bridge worker for the railroad since 1947, testified at his deposition that he had seen pedestrians on the bridge each of the fifty to one hundred times he had been there. Deposition of Louis Payeur at 6, 7. He observed both school children and workers using the bridge, *id.* at 8, but he never reported pedestrian use of the bridge to his superiors.

---

4. In its Reply Post-Trial Brief, Defendant asserts that it has not abandoned its position that the railroad's liability to Thibodeau would be barred by 35 M.R.S.A. § 1166, which provides:

> No railroad corporation shall be liable for the death of a person walking or being on its road contrary to law or to its valid rules and regulations.

In his Recommended Decision on Defendant's Motion to Dismiss or in the Alternative for Summary Judgment, the Magistrate determined that this statute does not bar liability for willful, wanton or reckless conduct as to a trespasser. Although it objected to other parts of the Magistrate's Recommended Decision, Defendant did not object to this determination by the Magistrate. Accordingly, Defendant waived its right

to *de novo* review of the Magistrate's decision on this issue. *See* 28 U.S.C. § 636(b)(1); *Park Motor Mart, Inc. v. Ford Motor Company,* 616 F.2d 603 (1st Cir.1980). This determination became the law of the case when the Court adopted the Magistrate's Recommended Decision in its Memorandum of Decision on Defendant's First Motion for Summary Judgment (January 16, 1985). In any event, it is clear under Maine case law that 35 M.R.S.A. § 1166 does not bar liability for wanton, willful or reckless conduct as to a trespasser. *See Robitaille v. Maine Central Railroad Co.,* 147 Me. 269, 270, 86 A.2d 386 (1952); *Willey v. Maine Central Railroad Co.,* 137 Me. 223, 226, 18 A.2d 316 (1961); *Collins v. Maine Central Railroad Co.,* 136 Me. 149, 154, 4 A.2d 100 (1939).

Chester E. Davis, Jr. was a bridge worker for the railroad who had been to the bridge approximately six times. On a "busy day," he saw as many as five pedestrians at one time on the bridge and a total of twenty to fifty during the course of the day. Deposition of Chester E. Davis, Jr. at 6, 8. He frequently complained to his foreman that it was useless to put "No Trespassing" signs on the bridge because they were either ignored or torn down. *Id.* at 18.

Elmer Belanger was an inspector for the railroad who visited the bridge once per year from 1965 to 1970 to inspect the ties. Deposition of Elmer Belanger at 7. He saw pedestrians of all ages using the bridge, *id.* at 10, and he saw children with bicycles in the vicinity of the bridge. *Id.* at 12.

In addition to the railroad employees themselves, a number of persons from the Lewiston-Auburn area testified that the bridge was heavily used by pedestrians, including bicyclists. Depositions of Robert Goyette, Clay Thibodeau, Mark Sheink; testimony of John Perino, Michael Morin.

The railroad has stipulated that it has been aware of pedestrian use of the bridge during daylight hours "for decades" and that bicyclists occasionally rode across the bridge. Agreed Statement of Facts, ¶¶ 7, 8. This stipulation would appear to obviate the need for the above summary of the testimony concerning pedestrian use of the

bridge. The testimony is important, however, as it illustrates the degree to which the bridge was freely used by many individuals, including children, living and working in the area, undeterred even by the presence of railroad personnel. Pedestrian use of the bridge clearly was not sporadic or unusual. A daily flow of pedestrians has crossed the bridge for decades.

The bridge clearly was and is unsafe for pedestrian use. Deposition of Sweeney at 58, 79. This assessment was reinforced by the Court's view of the bridge taken on the final day of trial of this case.[5] There are no guardrails to prevent a pedestrian from falling to the river below should he lose his footing. Several hazards can easily cause a loss of footing. Most notably, the spaces between the ties, which vary in width at various points on the bridge, could easily cause a pedestrian to trip or a bicyclist to lose control. In addition, the need to avoid stepping between the ties requires concentration which disables the pedestrian from watching out for other hazards. These include the rails themselves and a large nut and bolt protruding from either side of every fourth tie. These conditions are illustrated in photographs 6 and 7 of Exhibit E. There is no question that the bridge was not designed and is not safe for pedestrian use and that the railroad was aware that it was unsafe. Deposition of Sweeney at 58, 79.

The Court determined in its decision on Defendant's Motion for Summary Judg-

---

5. Immediately following the trial, at the request and in the presence of counsel, the Court conducted a view of the bridge and the surrounding area. On that occasion the Court observed two young people cross the bridge, one being a teenaged girl pushing a bicycle across the bridge from Auburn to Lewiston. She was on the "upriver" side of the bridge between the edge of the ties and the left rail.

The evidentiary status of observations made by a fact-finder during a view is uncertain. Many jurisdictions hold that a view is not itself evidence, but is only to assist the trier of fact in understanding the evidence. McCormick, *Law of Evidence* 539 (1972). This position has been criticized by commentators. *Id.;* 3 Louisell & Mueller, *Federal Evidence* § 390, at 681 (1979). The question apparently has not been authoritatively decided in the federal judicial system,

although the Supreme Court has noted that the "inevitable effect [of a view] is that of evidence, no matter what label the judge may choose to give it." *Snyder v. Massachusetts,* 291 U.S. 97, 54 S.Ct. 330, 78 L.Ed. 674 (1933) (overruled on other grounds in *Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653; disapproved on other grounds in *Duncan v. Louisiana,* 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491); *see also United States v. Walls,* 443 F.2d 1220 (1971). This Court is inclined to take the position that what is observed during a view *is* evidence, but there is no pressing need to decide the issue in this case. First, neither party objected to the view or requested that its use be limited. Second, the Court uses the impressions gained from the view in only a limited fashion, to aid it in evaluating other evidence of record and not as an independent source for finding of facts.

ment that the railroad did not impliedly invite members of the public to use the bridge. Now the Court faces the question of whether the railroad's failure to prevent its use or to make it safe for use was "willful, wanton or reckless."

Sweeney testified upon behalf of the railroad that the railroad never attempted to make the bridge safe for pedestrians because the pedestrians were regarded as trespassers, having no right to use the bridge. Deposition of Sweeney at 91. In 1969, the railroad attempted to secure enforcement of existing Maine laws forbidding trespass on railroad property. As a result, Lewiston police officers issued warnings or summonses to eleven individuals. Then District Court Judge Israel Alprin refused to authorize prosecution of those individuals based on his interpretation of the pertinent statute, 35 M.R.S.A. § 1167, and the long-time use of the bridge by the public. The railroad made no other efforts to secure enforcement of criminal laws against trespassing or to bring civil actions against trespassers. It abandoned all effort thereafter to effectively deter or prevent pedestrian traffic upon the bridge.

The railroad did intermittently post "No Trespassing" signs. These were often removed by vandals. Even when signs were posted, they were ineffectual in deterring pedestrian traffic. The railroad knew the signs were ineffective. Deposition of Sweeney at 41. "No Trespassing" signs were not posted on the bridge on the day that Thibodeau fell off. Deposition of Sweeney at 59. Nothing in the record indicates that any signs warning of the dangers involved in crossing the bridge were ever posted.

The Court finds that the railroad made no effective efforts to stem the flow of pedestrian traffic on the bridge even though it knew the bridge was unsafe. Moreover, the railroad knew that the token efforts it did make were entirely ineffective.

The record includes evidence concerning the feasibility of more effective means of eliminating the hazards posed by pedestrian use of the bridge. Use of the bridge by trains was very infrequent at the time of the accident. Robert Litvin, the car load manager for the railroad, testified at his deposition concerning the number of "spottings" of railroad cars on the Lewiston side of the river. There were seven spottings in 1977, fourteen in 1978, one in 1979, two in 1980, three in 1981 (the year of the accident giving rise to this case), one in 1982 and none since. First deposition of Robert Litvin at 32-45; second deposition of Litvin at 6. Any cars crossing the bridge had to adhere to a speed limit of ten miles per hour. Deposition of Thomas Graziano at 63. Indeed, since the spur ended just after reaching the Lewiston bank, no train could safely travel very fast over the bridge.

Louis D. Koshar, an engineer retained as an expert by the Plaintiff, testified at his deposition that one feasible method of deterring pedestrian traffic would be to erect barrier gates which could be opened to permit trains to pass. Deposition of Louis D. Koshar at 44-46; Exhibit V(L).[6] During its view of the site, the Court observed that erection of barriers on each bank would be feasible and would be effective to prevent pedestrian traffic on the bridge. Sweeney admitted that there is no engineering reason why barrier gates could not be erected. Deposition of Sweeney at 66. He testified

---

**6.** Defendant objected to the admission of all exhibits proffered in connection with Mr. Koshar's testimony. The basis for the objection was that any designs for deterring pedestrians or making the bridge safe are irrelevant because Plaintiff cannot prove how the accident happened. The objection being made before trial, the Court took it and several others under advisement. The Court now rules that the Koshar exhibits, labeled collectively as Exhibit V, shall be admitted. It is true that the evidence does

not show precisely how Thibodeau fell off the bridge because Mark Sheink, the only other person present, did not actually see him fall. The circumstances of the accident strongly support an inference, however, that a protective railing could have prevented his fall. Therefore, evidence of a design for pedestrian handrails is relevant. It is obvious that had Thibodeau not gained access to the bridge, he would not have fallen. Evidence of the feasibility of a barrier gate, therefore, also is relevant.

that railroad regulations prohibit the erection of barriers across "main line track," and that the track crossing the Auburn-Lewiston bridge is main line track. *Id.* at 89. He testified, however, that the designation of track as main line is made by the railroad. Sweeney did not know whether keeping the bridge open resulted in a profit for the railroad.

The railroad cites the testimony of Officer Perino in support of its position that a barrier would have been ineffective. At his deposition, Officer Perino was asked whether a barrier would be more effective than a "No Trespassing" sign. He responded:

> Yes, it would. Again, it would make it more of a danger. Most people are still going to use it by climbing over the barricade or whatever. That would increase the risk of somebody falling in.

Deposition of Perino at 54. The Court accords this testimony very little weight because there was no foundation indicating that Perino, a police officer, had any special knowledge regarding the effectiveness of barrier gates; nor was there any indication of what kind of "barricade" Officer Perino had in mind.

Based on the facts that railroad use of the track was infrequent, that erection of a barrier was physically practicable and that the railroad retained the discretion to remove the "main line" designation, the Court finds that erection of barriers was a feasible means of deterring pedestrian traffic at or before the time the accident occurred.

Alternatively, the erection of pedestrian handrails or a separate pedestrian walkway was a feasible, although perhaps more costly, method available to the railroad to make the bridge safer for pedestrian use. Depositions of Koshar, Sweeney. Koshar designed a curb and handrail system for the bridge. *See* Exhibit V(k). The cost of designing the system was $7,000, and the cost of constructing it would be approximately $16,000. Sweeney testified that installation of a guardrail would make inspection more difficult and maintenance, repairs and cleaning more costly. Deposition of Sweeney at 72. The feasibility of installing a pedestrian walkway and handrails is demonstrated by the existence of such improvements on other railroad bridges in Maine. Exhibits Q and U.[7]

The duty owed to a trespasser on a railroad track is to refrain from willful, wanton or reckless conduct. *Robitaille v. Maine Central Railroad Co.,* 147 Me. 269, 270, 86 A.2d 386 (1952); *Willey v. Maine Central Railroad Co.,* 137 Me. 223, 226, 18 A.2d 316 (1941); *Collins v. Maine Central Railroad Co.,* 136 Me. 149, 154, 4 A.2d 100 (1939). These cases do not specifically define what is meant by "wilful, wanton or reckless" misconduct in this context. It is safe to observe that the terms elude precise definition. Dean Prosser has explained:

> Lying between intent to do harm, which ... includes proceeding with knowledge that the harm is substantially certain to occur, and the mere unreasonable risk of

7. The Court took Defendant's objections to the admission of Exhibits Q and U under advisement. The Court now rules that these exhibits shall be admitted for the limited purpose of showing that installation of guardrails and walkways on railroad bridges is feasible. Exhibit Q is an Opinion and Order of the Commissioner of the Maine Department of Transportation concerning installation of walkways and handrails on certain railroad bridges, not including the bridge which is the subject of this case, to improve safety for railroad workers. Exhibit U is a photograph of Canadian National Railways' Mechanic Falls trestle, which has a handrail.

The Court will exclude two other exhibits offered by Plaintiff on the issue of feasibility. Exhibit R is a breakdown of costs for installation of walkways and handrails on two other Canadian National Railway bridges. This exhibit is irrelevant because there is no foundation indicating that the other bridges are structurally similar to the Lewiston-Auburn bridge. Exhibit S is a Canadian National Railway capital appropriation report for 1973, indicating that the annual net revenue for operation of the "Lewiston-Auburn Railway" was $330,000. This general figure for the entire spur has little bearing upon the feasibility, in terms of cost, of the railroad's installing a walkway and guardrail on the bridge.

harm to another involved in ordinary negligence, there is a penumbra of what has been called "quasi intent." To this area the words "wilful," "wanton," or "reckless," are customarily applied; and sometimes, in a single sentence, all three. Although efforts have been made to distinguish them, in practice all such distinctions have consistently been ignored, and the three terms have been treated as meaning the same thing, or at least as coming out at the same legal exit. They have been grouped together as an aggravated form of negligence, differing in quality rather than in degree from ordinary lack of care.... They apply to conduct which is still merely negligent, rather than actually intended to do harm, but which is so far from a proper state of mind that it is treated in many respects as if it were so intended.

. . . . .

The usual meaning assigned to "wilful," "wanton" or "reckless," according to taste as to the word used, is that the actor has intentionally done an act of an unreasonable character in disregard of a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow. It usually is accompanied by a conscious indifference to the consequences, amounting almost to willingness that they shall follow; and it has been said that this is indispensable. Since, however, it is almost never admitted, and can be proved only by the conduct and the circumstances, an objective standard must of necessity in practice be applied. This requirement therefore breaks down, and receives at best lip service, in any case where it is clear from the facts that the defendant, whatever his state of mind, has proceeded in disregard of a high degree of danger, either known to him or apparent to a reasonable man in his position.

*The result is that "wilful," "wanton" or "reckless" conduct tends to take on the aspect of highly unreasonable conduct, or an extreme departure from*

*ordinary care, in a situation where a high degree of danger is apparent.*

Prosser, *The Law of Torts*, § 34, at 184–85 (4th ed. 1971) (emphasis added).

The most thorough explication of "wanton misconduct" by the Maine Law Court was given in *Blanchard v. Bass*, 153 Me. 354, 139 A.2d 359 (1958). The plaintiff had been injured in an automobile accident and, wishing to avoid the defense of contributory negligence, alleged that the accident had been caused solely by the defendant's "wanton misconduct." He included no allegation of ordinary negligence. Thus, the court's need to define "wanton misconduct" was generated by its need to resolve the issue as to whether contributory negligence is a defense to a claim for wanton misconduct. The court held that "negligence and wanton misconduct differ in kind and degree," *id.* at 361, 139 A.2d 359, and that, therefore, contributory negligence is not a defense to wanton misconduct.

■ "In our view," the court in *Blanchard* stated, "wanton misconduct is neither a wilful wrong in the sense of an intentional infliction of harm, nor negligence in the sense of a failure to use due care." *Id.* at 358, 139 A.2d 359. Wanton misconduct is characterized by "a reckless disregard of danger to others." *Id.* The court concluded:

Wanton misconduct, however, cannot be entirely separated from negligence. The reckless act but not the infliction of injury is intended and so the injury or damage is accidentally suffered.

*Id.* at 361–62, 139 A.2d 359.

■ The Court finds that the railroad's failure, in the circumstances that existed as found above, to take effective measures to prevent injury to persons using the bridge constitutes wanton, willful and reckless misconduct. The critical facts underlying this conclusion are: the railroad knew that the bridge had been heavily used for decades by pedestrians of all ages, especially children and bicyclists; the railroad never took any effective measures to deter pedestrian use of the bridge; the bridge was used only sporadically and infrequently by

railroad cars from 1978 to the present; it was feasible for the railroad to erect a barrier gate or to modify the bridge to make it safe for pedestrian traffic; and the railroad knew that pedestrians and bicyclists using the bridge were exposed to a high risk of physical harm by falling from the bridge into the river.

The "reckless act" was the railroad's failure to take anything beyond token measures to prevent injury to pedestrians which it knew used the bridge every day. This act was intended. *See Blanchard, supra*, 153 Me. at 361–62, 139 A.2d 359. The Court has no trouble reaching the conclusion that the railroad's conduct was characterized by "a reckless disregard of danger to others." *Id.* at 358, 139 A.2d 359. The railroad had control of the bridge; it was uniquely in a position to take measures to stem the flow of pedestrian traffic, to prevent virtually inevitable injury or death. In effect, it did nothing. Its only response to the situation was to consistently maintain, through intermittent posting of signs, that pedestrians were trespassers. This stance, the railroad knew, was futile in preventing injury; its only purpose was to insulate the railroad from liability when injury did occur. The railroad's requirements for use of the bridge in no way militated against safety measures. In essence, the railroad's conduct evinces a callous indifference to a known condition of extreme danger to the public which it permitted to exist apparently on the conviction that the railroad could not be held liable if injury did in fact occur.

■ The Court also finds that the railroad's willful, wanton or reckless conduct was a proximate cause of Thibodeau's plunge. The railroad argues that because Plaintiff has not shown precisely how Thibodeau fell from the bridge, Plaintiff has not proven that the railroad's conduct was a substantial cause of his fall. It is true that Mark Sheink, the only witness present, did not see how Thibodeau fell. Sheink was walking five to ten steps behind Thibodeau. He heard "something like a ca-thump," then a splash. Deposition of Sheink at 25. Then he heard Thibodeau screaming for help. *Id.* at 28.

Plaintiff does not need to prove precisely how Plaintiff fell. Insofar as the railroad's unlawful conduct consisted of its failure to take effective measures to deter pedestrian use of the bridge, it was a substantial and proximate cause of Thibodeau's fall. Had he not gained access, he would not have fallen. Even if Thibodeau had the will and ability to climb a well-constructed barrier, such a barrier would have made it nearly impossible to take a bicycle across the bridge. Alternatively, Plaintiff has proven by a preponderance of the evidence that a properly constructed railing would have prevented Thibodeau's fall. The Court is satisfied that Thibodeau's fall was accidental, and that only by an intentional leap could he have surmounted a guard railing.

### C. *Liability to the Rescuer*

The Court has undertaken the above analysis only to determine whether Thibodeau's fall was caused by a breach of a duty owed to Thibodeau. Because it has decided the question affirmatively, the Court need not determine whether the Defendant may be held liable to a rescuer if it has breached no duty owed to the rescued party.

The only Maine case that deals with the so-called "rescue doctrine" is *Hatch v. Globe Laundry Co.*, 132 Me. 379, 171 A. 387 (1934). In *Hatch*, an employee of the defendant left an electric truck parked on a hill; he did not remove the key. Two boys, aged four and five, got into the truck and turned the rheostat, causing the truck to move. The plaintiff jumped into the moving truck to attempt to stop it, but, not knowing how to operate an electric vehicle, failed. He was forced to turn the truck off the road to avoid an accident, and was thrown off and injured. The defendant argued that the act of the children was an intervening cause of plaintiff's injury, for which the driver was in no way responsible. The rule applied by the Court was that the defendant is liable if the intervening act of the third party was foreseeable, or within " 'the range of reasonable apprehension.' "

*Id.*, at 385, 171 A. 387 (*quoting Palsgraf v. Long Island R.R. Co.*, 248 N.Y. 339, 345, 162 N.E. 99).

██ In this case, it clearly was foreseeable that a pedestrian or bicyclist might fall off the railroad bridge. The railroad knew the bridge was unsafe, and that it was used by pedestrians and bicyclists. The specific manner in which the fall occurred need not have been foreseeable. It is enough that the event which caused Officer Bonney to undertake a rescue—a person falling off the bridge—was within the range of reasonable apprehension.

The *Hatch* case also briefly addressed the standard of care applicable to a rescuer:

> It would be a distinct reproach to the law to hold that one must act at his peril, who risks his own safety to protect those put in jeopardy by the negligence of a third person. The overwhelming weight of authority is that one attempting to rescue another under such circumstances is not, by exposing himself to imminent danger, to be held negligent unless his conduct is to be regarded as rash or reckless.

*Id.* 132 Me. at 388, 171 A. 387. The Court finds that Officer Bonney's conduct in attempting to rescue Thibodeau was not rash or reckless. He was an experienced swimmer who had had some training in water safety. Officer Perino, the strongest swimmer on the Auburn police force, testified that the unexpectedly low temperature of the water caused him to lose strength rapidly and nearly drown. Officer Bonney's only miscalculation, if any, was that he failed to anticipate the debilitating effects of the frigid water. This does not rise to the level of rash and reckless conduct.

Any contributory negligence of Thibodeau will not preclude recovery by the party attempting the rescue. *Id.* at 388, 171 A. 387. Certainly the facts of this case raise an issue as to whether Thibodeau's own conduct would have barred recovery by his survivors, but it does not bar recovery by Plaintiff Bonney.

In summary, the railroad breached a duty owed to Thibodeau to refrain from wanton, willful or reckless conduct. This breach of duty caused Thibodeau to fall from the bridge; Thibodeau's fall was a "foreseeable event," and it led directly to Officer Bonney's foreseeable and reasonable rescue attempt. The railroad must be held liable for damages attributable to Officer Bonney's death during the course of his rescue attempt.

### D. *Professional Rescuer Defense*

The railroad contends that the Plaintiff's recovery is barred by the professional rescuer doctrine, which provides that a rescuer who undertakes a rescue in the course of performing his professional duties may not recover for injuries suffered during a rescue. The Maine Law Court has not decided whether the doctrine is recognized in Maine. The Court has ruled that if the facts would justify application of the doctrine in this case, it will certify the question to the Maine Law Court. Memorandum of Decision on Defendant's First Motion for Summary Judgment (January 16, 1985).

Based upon its perusal of the cases cited in Defendant's Trial Brief and other cases, the Court has determined that even if the professional rescuer doctrine were adopted in Maine, it would not be applicable in this case. The professional rescuer doctrine is traditionally known as the "fireman's rule" because it was developed to bar recovery by firemen injured while fighting a negligently-caused fire. *See Walters v. Sloan*, 20 Cal.3d 199, 142 Cal.Rptr. 152, 571 P.2d 609, 610 (Sup.Ct.Cal.1977). Courts have stated that a firefighter " 'cannot complain of negligence in the creation of the very occasion for his engagement.' " *Giorgi v. Pacific Gas and Electric Company*, 266 Cal.App.2d 355, 72 Cal.Rptr. 119, 122 (Ct. App.1968) (*quoting Krauth v. Geller*, 31 N.J. 270, 157 A.2d 129, 131. The doctrine has also been applied to police officers injured in the course of performing their duties. *See Berko v. Freda*, 172 N.J.Super. 436, 412 A.2d 821 (1980); *aff'd* 182 N.J.Super. 396, 442 A.2d 208, 93 N.J. 81, 459 A.2d

663; *Wilson v. Florida Processing Co.,* 368 So.2d 609 (Fla.App.1979). The fireman's rule was developed in the context of landowner liability; a fireman was characterized as a "licensee" not entitled to recover for the ordinary negligence of the landowner. *See Walters, supra,* 571 P.2d at 611. The more modern theory is that professional rescuers, by engaging to perform certain duties, have assumed the risk of dangers knowingly confronted during the performance of those duties. *Id.* at 612.

■ Recovery by a police officer is barred when he is performing a task which is among the duties which are part of his job. A police officer who was injured while subduing an intoxicated person could not recover because he was "performing his official duties" and "manifested his consent to assume the risks." *Hannah v. Jensen,* 298 N.W.2d 52, 54 (Minn.Sup.Ct.1980). The issue is "whether the [police officers] were acting in discharge of their professional duties when they were allegedly injured." *Whitten v. Miami-Dade Water & Sewer*

*Authority,* 357 So.2d 430, 432 (Fla.App. 1978). In *Wilson, supra,* a police officer who was injured while evacuating residents from the area of a chlorine gas leak was barred from recovering. The Court concluded that evacuation of endangered citizens "forms a part of precisely what policemen are hired to do and falls directly under the ordinary course of the duties of that occupation." *Id.,* 368 So.2d at 611. Clearly, the rule is limited to those cases in which the professional rescuer was performing his official duties.[8] *See also Giorgi, supra,* 266 Cal.App.2d 355, 72 Cal.Rptr. at 121 (federal employees injured while fighting fire required to fight forest fires and were trained for such work); *Buchanan v. Prickett & Son, Inc.,* 203 Neb. 684, 279 N.W.2d 855, 859 (1979) (fireman barred from recovering for undertaking risk which he has "engaged to encounter by virtue of his employment and one which it is his duty to accept ..."); *Spencer v. B.P. John Furniture Corporation,* 255 Or. 359, 467 P.2d 429, 431 (1970) (fireman "does not have the privilege of refusing to fight [a] fire ... He undertakes to fight all fires."), overruled

**8.** The railroad sought to introduce evidence that Officer Bonney's wife received state workers' compensation benefits and federal Law Enforcement Assistance Administration death benefits, arguing in its trial brief that the award of these benefits shows that Officer Bonney died while performing a duty of his employment. Plaintiff objected to the admission of this evidence, labeled as Exhibits I and J. The issue under consideration is whether Officer Bonney's rescue attempt was part of his official duty as a police officer, which he was obligated to perform in return for compensation from the City of Auburn. The fact that his spouse received state and federal benefits that bear some relation to his employment is relevant to resolution of this issue. The Court therefore will admit Exhibits I and J over objection. The Court, however, accords them minimal weight. Workers compensation benefits are available for any injury "arising out of and in the course of employment." 39 M.R.S.A. § 51. This standard has been construed broadly, *see, e.g., Comeau v. Maine Coastal Services,* 449 A.2d 362 (Me.1982), and does not focus on the significant distinction here between obligatory duties and tasks voluntarily undertaken. Federal death benefits are available to the survivors of public safety officers who die "in the line of duty." 42 U.S.C. § 3796(a). The phrase "line of duty"

means any action which an officer whose primary function is crime control or reduction, enforcement of the criminal law, or suppression of fires is *obligated or authorized* to perform ...

28 C.F.R. § 32.2(c). As discussed in the text, Officer Bonney clearly was not obligated to undertake the water rescue under the terms of his employment. His act may have been "authorized" in the sense that he violated no rules in undertaking the rescue, but this is not sufficient to bring him within the professional rescuer exception.

During trial, the Court admitted, over Defendant's objection, testimony from Mrs. Bonney and Officer Perino to the effect that Officer Bonney posthumously received a Carnegie Award for actions taken "above and beyond the call of duty." Although this characterization of Officer Bonney's actions is in accord with the more compelling evidence regarding the duties of an Auburn police officer, *see* accompanying text, the Court will give the award minimal weight. Like the death benefits considered above, the award represents the judgment of a third party made for purposes different from those underlying the professional rescuer doctrine.

**1010**

by *Christensen v. Murphy,* 296 Or. 610, 678 P.2d 1210 (1984).[9]

■ Officer Bonney was a patrolman with the Auburn Police Department. Michael Morin, a former Auburn police officer who was with Officer Bonney the night he died, testified that the Auburn Police Department did not require that police officers know how to swim. This was corroborated by Officer Perino. At the time of the accident, the Auburn Police Department had no policy regarding water rescue and no in-house training on water rescue. Testimony of Michael Morin, John Perino. An Auburn police officer was not required to enter the water to rescue a person. Testimony of John Perino. The majority of Auburn police officers do not know how to swim. *Id.* Nothing in the police officer's job description, admitted as Exhibit L, or the Auburn Police Department's Manual of Procedure, admitted as Exhibit M, indicates that a police officer had any duty to undertake a water rescue. Clearly, it was not the policy of the Auburn Police Department that a police officer should enter the water to rescue a drowning person. Nor would such a duty be consistent with common perceptions of the duties of law enforcement officers.

Defendant points out that Officer Bonney completed a Red Cross course in "Basic Water Safety" while attending the Municipal Police School at the Maine Criminal Justice Academy. Exhibit G. First, the fact that Officer Bonney completed such a course does not necessarily bear upon the scope of his duties as an Auburn police officer. More importantly, there is no evidence indicating whether the course included instruction on individual water rescue of the kind undertaken by Officer Bonney. Absent such a foundation, the fact that he took the course is irrelevant to determining the scope of his official duties. Evidence of the fact that Officer Bonney also took a course in "Basic Rescue" suffers from the same defects.

The railroad also relies on the following deposition testimony of Auburn Police Chief Peter Mador, elicited by an attorney for the Plaintiff:

Q Based on your review of the police report, as well as your discussions with the various officers who responded, did you reach a conclusion as to whether Officer Bonney had acted in accordance with Auburn Police Department procedures as they then existed for that situation?

A We couldn't find any fault with the actions taken.

Q Would it be fair to say your conclusion was that he did act in accordance with the department's procedures applicable to that situation?

A Yes.

MR. SWEET: I have nothing further.

Deposition of Peter Mador, at 11–12. This testimony is ambiguous; it does not directly answer the question as to whether Officer Bonney had a duty to enter the water; any such inference would be negated by the testimony of Officers Perino and Morin that Auburn police officers were not even required to know how to swim. The above testimony is more appropriately interpreted as expressing Chief Mador's desire to refrain from criticizing Officer Bonney's conduct. The railroad's counsel had the opportunity to question Chief Mador directly about the scope of an officer's duties, but did not do so at the deposition. Chief Mador was not called at trial, Defendant electing to rest on his deposition testimony.

The Court can only conclude that the professional rescuer doctrine, as generally articulated, would not bar Plaintiff's recovery in this case. Because the doctrine would not be "determinative of the cause" within the meaning of Me.R.Civ.P. 76B, the Court will decline to certify the question as to whether it is recognized in Maine. *See*

---

**9.** In *Christensen,* the Oregon Supreme Court abandoned the "fireman's rule," noting that "its major theoretical underpinning is gone." 678 P.2d at 1217. The citation of the overruled *Spencer* case in the text is made only for the purpose of illustrating the scope of the rule at the time it was recognized in Oregon, *Christensen* is a recent example of judicial dissatisfaction with the rule. *See* 678 P.2d 1214, n. 5 for citations to recent commentaries on the rule.

*Gagne v. Carl Bauer Schraubenfabrick, GmbH,* 595 F.Supp. 1081, 1088 (D.Me.1984).

### III. *Damages*

 Four elements of damages must be considered: (1) funeral expenses; (2) loss of comfort, society and companionship; (3) pecuniary loss; and (4) conscious pain and suffering. *See* 18–A M.R.S.A. § 2–804 (Supp.1984–1985). The parties have agreed that if liability is found, Plaintiff shall receive $635 for funeral expenses and the statutory maximum of $50,000 for loss of comfort, society and companionship. *Id.*

The primary dispute with respect to damages concerns the pecuniary loss suffered by the Plaintiff. Plaintiff is entitled to recover the present value of probable future pecuniary loss suffered as a result of her husband's death. *Dostie v. Lewiston Crushed Stone Co.,* 136 Me. 284, 8 A.2d 393 (1939). Each party presented an expert witness on the subject of pecuniary loss, and, not surprisingly, they disagreed.

Economist Robert Doucette, retained by the Plaintiff, set the present value of the pecuniary loss to the estate, as of the date of his deposition on April 19, 1984, at $639,287. Economist Robert M. MacDonald, retained by the Defendant, arrived at a figure of $421,000 as of the date of his deposition on August 31, 1984. The wide discrepancy is explained by three points of disagreement.[10]

First, the economists disagreed over one of the elements used in calculating future earnings, that is, the ratio of actual compensation to base pay. Doucette used a ratio of 1.39. MacDonald selected a figure of 1.30. MacDonald testified that Doucette's figure was too high because it took into account the year 1981, during which the ratio was unusually high. MacDonald would exclude the income figure for 1981 on the assumption that it may have included some payments attributable to Bonney's death which are not properly includable in the calculation of lost earnings. MacDonald conceded, however, that he did not know if any amounts received in 1981 in-

cluded payments related to death. Deposition of Robert MacDonald at 17. Doucette's ratio was based on actual amounts received by Bonney from his employer. Because MacDonald's decision to exclude the year 1981 is based only upon speculation, and Doucette's calculation is based upon actual amounts paid, the Court will accept Doucette's ratio.

MacDonald also took Doucette to task for failing to deduct an amount attributable to Bonney's personal consumption from his projected retirement income. Doucette later conceded that retirement consumption should be deducted, but he argued that he compensated for this oversight elsewhere in his analysis when he neglected to project the expected loss of Mrs. Bonney's income based upon the statistical likelihood that a woman's working life ends at the age of fifty-two. The Court is not satisfied by Doucette's explanation for failing to account for retirement consumption, in light of the fact that he agrees it should be considered. No reason was given for offsetting such disparate items as loss of the spouse's income and retirement consumption. Therefore, the Court will reduce the projected retirement income by $35,500, in accordance with MacDonald's calculation.

The most significant area of disagreement between Doucette and MacDonald concerns the method of calculating the present value of lost future income. Specifically, the two economists disagree over the interest rate to be used to calculate the present value of lost future income. Doucette uses no specific interest rate, but instead assumes that interest rates and the earnings growth rate, consisting of productivity growth and inflation, will offset one another during the projected earnings period; thus he makes no deduction for interest to establish present value. MacDonald assumes that interest rates will exceed the earnings growth rate by 3%; thus, he would discount total future income, using a net interest rate of 3%, to arrive at present

---

**10.** The depositions of both experts were admitted into evidence by agreement of the parties.

The experts also testified at trial, focusing upon their areas of disagreement.

value. The different methods yielded a discrepancy of $130,000.

Doucette's method is based upon historical data from the past thirty years, showing that interest rates and earnings growth rates have offset one another. Relying on this data, Doucette does not need to project a specific amount for either figure. MacDonald used the same method for some twenty years, but abandoned it after observing different economic trends in the late 1970's and early 1980's. MacDonald argues that the changes are so fundamental that the history of the prior thirty years can no longer be relied upon. Instead, he anticipates that interest rates will continue to exceed earnings growth rates by 3%. Thus he applied a then-current, long-term bond rate of 12.25% and assumed that the earnings growth rate would be 3% lower, or 9.25%. Interestingly, Doucette previously used MacDonald's theory himself but, in the late 1970's, utilizing then-current data, he concluded that the earnings growth rate would equal the interest rate.

The Court admits to some difficulty in electing between the methods used by two qualified and reputable economists, each of whom once used the other's method. Neither method pretends to scientific precision; each yields an estimate to which a margin of error attributable to unpredictable changes in the economy must be applied. Given the fact that both methods of calculating present value have some merit, the Court finds that it is likely that Doucette has erred on the high side and MacDonald on the low side in predicting the future economic loss that will actually occur. Accordingly, the Court finds that the probability is that a figure midway between those determined by Doucette and MacDonald best represents the approximate present value of lost future earnings. *See Dostie v. Lewiston Crushed Stone Co.*, 136 Me. 284, 290, 8 A.2d 393 (1939) (award of compensatory damages for loss of future income must be based on probabilities).

Plaintiff has agreed to stand by the pecuniary loss figure given by Doucette at the time of his deposition, which was $639,287. Starting from that figure, the Court will deduct $35,500 for personal retirement consumption. The Court will also deduct one half the difference attributable to the different methods of accounting for interest and earnings growth rate, or $65,000. Total pecuniary damages in the amount of five hundred thirty-eight thousand seven hundred eighty-seven dollars ($538,787) will be awarded. In addition, fifty thousand dollars ($50,000) will be awarded for loss of comfort, society and companionship, and six hundred thirty-five dollars ($635) will be awarded for funeral expenses.

Finally, the Court reaches the matter of conscious pain and suffering. The most useful evidence on this issue is the testimony of Officer Perino, who also entered the water the night Thibodeau and Officer Bonney died. Perino arrived after Bonney had entered the water to attempt the rescue. He swam out and saw Bonney, who had hold of Thibodeau. Bonney pushed Thibodeau to Perino and told Perino to get out of the water. The act of pushing Thibodeau pushed Bonney into the strong current in the middle of the river. Perino saw the silhouette of Bonney's head going downriver. As he tried to save Thibodeau, Perino grew tired and numb quickly in the extremely cold water. He lost Thibodeau. He then became worried that he would not be able to make it to shore. He was finally thrown a rope and pulled to shore; he is convinced that he wouldn't have been able to swim back to shore.

Officer Bonney's body was recovered the next morning. Based upon Officer Perino's account, it is likely that Officer Bonney suffered many of the same sensations, the coldness of the water, the numbness, the sense of hopelessness as his strength waned. He was conscious as he drifted in the current away from Perino, shouting at Perino to get out of the water. He must have been conscious as the strength he needed to save himself dwindled. He must have been aware that he was about to drown. He must have suffered horribly, mentally and physically, in the moments

before he lost consciousness. However inadequate it may be, the law permits monetary damages for such suffering. Accordingly, the Court will award Plaintiff one hundred thousand dollars ($100,000) for conscious pain and suffering of the decedent.

Judgment shall be entered in favor of the Plaintiff in the amount of six hundred eighty-nine thousand four hundred twenty-two dollars ($689,422).

So ORDERED.